SIERRA CLUB, et al., Plaintiffs,

v.

John O. MARSH, Jr., et al., Defendants.

Civ. No. 88–0116–B.

United States District Court, D. Maine.

Sept. 30, 1988.

On Motion For Stay Oct. 19, 1988.

Supplemental Memorandum Nov. 7, 1988.

Edward F. Lawson, Weston, Patrick, Willard & Redding, Boston, Mass., Tybe A. Brett, Portland, Me., for plaintiffs.

Thomas G. Reeves, Chief Counsel, Legal Div. Me. Dept. of Transp., Augusta, Me., for Maine Dept. of Transp.

Daniel S. Goodman, U.S. Dept. of Justice, Land & Natural Resources Div., Environmental Defense Section, Washington, D.C., Michale Dubose, Asst. U.S. Atty., Bangor, Me., for U.S.

## MEMORANDUM DECISION ON MOTION FOR PRELIMINARY INJUNCTION

CYR, Chief Judge.

This is the third round of litigation over the proposed development of a marine dry cargo terminal on Sears Island in Penobscot Bay. The plaintiffs, Sierra Club and two of its members, seek declaratory and injunctive relief suspending the permits recently issued for the Sears Island project by the United States Army Corps of Engineers [the Corps] and the United States Coast Guard [the Coast Guard], and enjoining funding of the project by the Federal Highway Administration [FHWA]. In addition to the federal defendants, plaintiffs join the Maine Department of Transportation [MDOT], the proponent of the project, as a defendant.

## I. BACKGROUND

Sears Island is an uninhabited, undeveloped, and mostly forested 940–acre island located in upper Penobscot Bay, near Searsport, Maine. The island is connected to the mainland by a gravel bar which is submerged except at low tide and is covered by no more than four feet of water at high tide. Pursuant to a Port Planning and Development Program established in 1976, MDOT targeted the Searsport area for potential development of a modern seaport facility capable of competing with new port facilities outside Maine.[1]

The proposed MDOT Sears Island marine dry cargo terminal itself would involve the development of approximately 50 acres near the western shore of the island.[2] The overall project includes provisions for the development of a 160–acre industrial park adjacent to the terminal. The preferred design envisions a 27–acre marginal wharf with two ship berths, having the potential for future expansion to 35 acres and 6 berths. Access to the mainland would require construction of a 2.3 mile-long, two-lane highway, including a 1,200′ causeway and a 1.5 mile railroad spur along the length of the gravel bar connecting the island and the mainland.

MDOT considered alternative sites for the proposed port, including two sites on nearby Mack Point, near the mainland end of the proposed Sears Island causeway. Unlike Sears Island, Mack Point is already 50% developed, and further development of Mack Point would require working around existing industrial and port facilities. MDOT rejected both of the alternative sites on Mack Point as impracticable in light of the overall project purposes. The configurations of the Mack Point alternatives and the preferred Sears Island site are depicted in Appendix A.

Plaintiff Sierra Club has commenced two previous actions relating to the proposed Sears Island port development. In *Sierra Club v. Marsh*, 769 F.2d 868, 877–78 (1st Cir.1985) (*Sierra Club I*), the First Circuit held that the federal defendants—the Corps and FHWA—erred in finding that the project would have no significant environmental impacts necessitating the preparation of an environmental impact statement [EIS] pursuant to the National Environmental Policy Act [NEPA], 42 U.S.C. § 4332. The First Circuit concluded that the combined impacts resulting from the construction of the causeway and the port (which the Corps and FHWA had addressed) and the likely industrial development which the port facility would attract (which was not adequately considered) were significant enough to require preparation of an EIS. Consequently, further construction and funding of the project were enjoined, but not before substantial clearing and grading had been done at the proposed Sears Island terminal site and approximately 303,000 cubic yards of dredged material (approximately 60% of the total required to complete the initial one-berth terminal called for in phase I of the proposed project) had been removed. *See* Final EIS, at iv.

In *Sierra Club v. Secretary of Transportation*, 779 F.2d 776 (1st Cir.1985) (*Sierra Club II*), the First Circuit held that the Coast Guard had acted arbitrarily and capriciously in issuing a permit under the General Bridge Act of 1946, 33 U.S.C. § 525(b), for construction of a "bridge" along the 1,200′ gravel bar between Sears Island and the mainland. The court ruled that by including a 2–foot diameter pipe through the planned causeway MDOT had not transformed the "causeway," for which

---

**1.** Other industrial development proposals for Sears Island included a nuclear-powered electricity generating plant, a coal-fired power plant, a petroleum refinery, and an aluminum reduction plant. *See Sierra Club v. Marsh,* 769 F.2d 868, 872 (1st Cir.1985).

**2.** The final EIS [FEIS] included the 50 acre estimate for the terminal. However, during the five-month interval between the FHWA approv-

al of the FEIS and the issuance of the Corps permit, MDOT consultants revised the acreage requirements of the ship loading and unloading facilities to 124 acres at full buildout. The estimates for a two-berth and a four-berth terminal are 68 and 100 acres, respectively. *See* Letter from Olko Engineering, Plaintiffs' Appendix, at 131.

the permitting process is more searching,[3] into a "bridge." Thus, the permit under the General Bridge Act was found to be invalid. The First Circuit expressed no opinion as to whether Sierra Club would have a private right of action to challenge a *causeway* permit issued by the Coast Guard under the proper statute, i.e., section 9 of the River and Harbors Appropriation Act of 1899, 33 U.S.C. § 401.[4]

In response to these First Circuit decisions, the federal defendants commenced the preparation of an EIS. FHWA was designated the lead agency in the EIS process. *See* 40 C.F.R. §§ 1501.5 & 1508.16. Other federal agencies participating in the EIS process were funding agencies, such as the Economic Development Administration [EDA] and the Federal Rail Administration [FRA]; permitting agencies, such as the Corps and the Coast Guard; and environmental or resource agencies, such as the Environmental Protection Agency [EPA], the Fish and Wildlife Service [FWS], and the National Marine Fisheries Service [NMFS]. FHWA delegated its responsibility for preparation of the EIS to MDOT, which in turn engaged two private consultants, Normandeau Associates, Inc., and Economic Research Associates.[5]

Pursuant to 40 C.F.R. § 1507, FHWA published a notice of intent to prepare an EIS for the Sears Island project, *see* 50

Fed.Reg. 35400 (Sept. 4, 1985), and Normandeau Associates prepared a "scoping" document preliminarily identifying the subject matter of the EIS. On December 5, 1985, a scoping meeting was held among all agencies participating in the EIS process. A second meeting was held on February 12, 1986, at which the participating agencies discussed the scope of the EIS treatment of the purpose and need of a cargo terminal, alternatives to the Sears Island site, the affected environment, the environmental consequences of alternatives, and mitigation measures.

A preliminary draft EIS [DEIS] was distributed among the cooperating agencies on April 23, 1986, in preparation for an EIS progress report meeting on May 12, 1986, at which there was criticism of the MDOT decision to reject both Mack Point sites as impracticable alternative sites for the project. It was suggested that the Mack Point alternatives be carried through the full impact analysis, at the same level as the Sears Island site. In addition, disagreement was expressed, principally by FWS, concerning the MDOT proposal for analyzing secondary impacts, which were to be limited to currently viable development proposals.[6]

The DEIS was issued on July 7, 1986, and a public hearing on the DEIS was held

---

**3.** The court noted that,
[h]ad the permit application been for a causeway, the Coast Guard would have had to consider whether the causeway crossed an intrastate or interstate waterway, whether congressional or state approval was necessary, and whether such approval existed. By treating the causeway as a bridge, the Coast Guard avoided answering those questions.
779 F.2d at 783.

**4.** Moreover, the First Circuit saw "no need ... to make any holdings about what would have been required had the Coast Guard treated the structure as a causeway" or to express an opinion "as to whether the consent of Congress was required for the approval of causeway construction and whether the Department of Transportation Act of 1966 did or did not provide the necessary approval." 779 F.2d at 784.

**5.** Only Normandeau Associates and Economic Research Associates are listed in the EIS Table of Preparers. However, T.Y. Lin International/Hunter–Ballew Associates, Olko Engineering

and Booz–Allen and Hamilton, Inc. were also hired by MDOT and provided reports which were used in preparing the EIS, including reports on suggested designs for the Sears Island and Mack Point terminals.

**6.** EPA followed up the meeting with written comments to FHWA on the preliminary DEIS. The letter noted EPA's view that "the decision by FHWA and Maine DOT that there are no reasonable alternatives to the original proposal and that the EIS will address only the Sears Island site in detail is not consistent with the Council on Environmental Quality's regulations ... and cannot be substantiated by ... the record." Letter from Elizabeth A. Higgins to William Richardson (May 30, 1988), at 1. EPA expressed its fundamental disagreement "with the approach of evaluating only the secondary growth likely to occur as a result of the cargo terminal while not evaluating potential development due to the newly created access to the island." *Id.* at 5.

August 21, 1986. FHWA described the meeting as follows:

> Approximately 100 persons attended the hearing with 12 making prepared statements. As anticipated, most of those speaking were from the local community and were in favor of the projects for two main reasons. One was the belief that construction of the facility would spur the local depressed economy by providing jobs. The second was expressed primarily by shipping interests and was based on the strong belief that the existing port facilities at Mack Point are outmoded, overcrowded and unsafe.
>
> As also anticipated, the Sierra Club strongly denounced the project as unneeded and based on erroneous or misleading and/or incorrect data in the DEIS. Actually, the Sierra Club's contentions were clearly stated and appropriately referenced to applicable sections of the DEIS. This will facilitate efforts in responding to Sierra Club concerns. It is important to note that no new issues were introduced and oddly enough, very few environmental concerns were voiced by opponents.

FHWA File Memorandum by William Richardson (Aug. 22, 1986).

**7.** MDOT identified the following necessary steps in analyzing the Mack Point alternatives:

> Advise consultants that they should begin all planning necessary to revise the E.I.S., and particularly instruct ERA to initiate an analysis of secondary impacts for Mack Point. Aside from this they would be advised that the general basis for revision would be existing data and information, including that which is currently being developed by the team.
> It will be necessary to do some rescoping with the Corps and perhaps other permitting and funding agencies to insure that the concept above is acceptable i.e. use existing and available data and information for the most part. We would restructure and strengthen Section I (needs) as currently planned.
> Section II would be totally different, but simplified, and probably conclude by eliminating all alternatives except for two sites in Searsport. The preferred site would continue to be identified here.
> Section III should be revised and simplified now by compiling most of the highly technical and/or scientific data into a separate technical backup document. This should be done in any event.

EPA continued to express its disapproval of the rejection of the Mack Point alternatives. Whereupon, MDOT decided that the FEIS would include a full analysis of the impacts of the Mack Point alternatives. *See* State of Maine Inter–Departmental Memorandum by David A. Ober (Dec. 17, 1986).[7] Meanwhile, EPA hired a consultant, Temple, Barker and Sloane [TBS], to prepare a study on the practicability of the Mack Point alternatives. At a meeting on May 14, 1987, representatives of MDOT, FHWA, EPA, and the Corps discussed apparent conflicts between the conclusions of TBS (which concluded that, given market *demand,* Mack Point would be adequate at least through the year 2000) and Booz–Allen and Hamilton [Booz–Allen] (which concluded that, based on market *potential,* Mack Point could not practicably handle forecasted cargo volumes).

A preliminary FEIS was issued in late August 1987, and despite continued opposition by FWS, NMFS and EPA, the FEIS was approved by FHWA on October 9, 1987. After receiving additional comments on the FEIS from environmental agencies and Sierra Club,[8] *inter alia,* on December 18, 1987 FHWA issued its Record of Deci-

> Section IV would be overhauled by bringing in most of the comparative data related to Mack Point–Sears Island into the section. This would essentially be totally redone and provide all the detailed analysis clearly supporting the preferred alternative also identified in Section II.
> Mitigation would probably be expanded to include those measures adaptable to Mack Point as well as a full evaluation of secondary impacts.

State of Maine Inter–Departmental Memorandum by David A. Ober (Dec. 17, 1986).

**8.** FWS objected to the FEIS on the basis that significant issues remained as to the

> need for the marine cargo terminal, alternative methods of stimulating economic and industrial development, alternative marine terminal sites and layouts, water quality, wetland and other Clean Water Act compliance matters and related issues pertaining to the selection of the least environmentally damaging practicable alternative.

Letter from Gordon Beckett to William F. Lawless (Nov. 20, 1987). Sierra Club raised similar objections. *See* Letter from Priscilla A. Chapman to William Richardson (Nov. 19, 1987).

sion [ROD] finally approving the Sears Island project.

Prior to issuing permits under section 404 of the Clean Water Act, 33 U.S.C. § 1344, and subsequent to issuance of the FEIS, the Corps conducted further review of the MDOT permit application. On December 1, 1987, and again on February 19, 1988, the Corps held meetings with EPA, FWS and NMFS to discuss opposition to the selection of Sears Island. Notwithstanding the failure to resolve differences with the environmental agencies, on March 14, 1988 the Corps Division Engineer issued the Corps ROD approving the MDOT application for a permit for the Sears Island project. EPA sought formal review of the Division Engineer's decision by the Assistant Secretary of the Army, who gave final Corps approval for the project on May 11, 1988.[9]

On July 22, 1988, the Coast Guard issued its ROD permitting MDOT to construct the causeway to Sears Island.

## II. PRESENT PROCEEDINGS

Plaintiffs filed a three-count complaint for injunctive and declaratory relief on May 19, 1988. A fourth count was added by the amended complaint filed on August 16, 1988, joining the Coast Guard as a defendant. Upon learning that MDOT planned to resume project construction on August 29, 1988, plaintiffs filed their motion for preliminary injunctive relief on August 12, 1988. Hearing was held on the motion for preliminary injunction on September 8, 1988.[10]

Count I alleges that the Coast Guard acted arbitrarily and capriciously in issuing a permit for construction of the causeway to Sears Island without congressional approval. Plaintiffs specifically challenge the Coast Guard determination that the causeway construction site is a "river or other waterway, the navigable portions of which lie wholly within" Maine, under 33 U.S.C. § 401. Review is sought pursuant to the Administrative Procedure Act [APA], 5 U.S.C. § 706(2)(A).

Count II alleges that the Corps permit violates the Clean Water Act, 33 U.S.C. § 1344(b)(1), and EPA regulations, 40 C.F.R. § 230.10(a)(1), in that Mack Point offers practicable alternatives to the Sears Island site which would have less impact on the aquatic environment.

Count III alleges that the Corps violated its own regulations by: (1) issuing a permit without first undertaking independent review of information provided by MDOT and its consultants, as required by 33 C.F.R. § 302.4(a)(1); (2) failing to provide adequate review of the need for the project and of reasonable alternatives, as required by 33 C.F.R. § 302.4(a)(2); and (3) failing to consider the cumulative effect on wetlands alterations, as required by 33 C.F.R. § 320.4(b)(3).

Count IV alleges that FHWA and the Corps failed to comply with EIS procedures prescribed by NEPA and its companion regulations. Plaintiffs contend that significant additional information regarding the environmental impacts of the Sears Island project—including information that a six-berth facility would require development of 124 acres of upland, rather than the 50 acres stated in the FEIS—was received and relied on subsequent to FHWA approval of the FEIS. Plaintiffs assert that this new information necessitated preparation of a supplemental EIS.

Plaintiffs further allege that FHWA violated NEPA by: (1) responding inadequate-

9. Under Corps regulations, "the initial decision [is] made by the district engineer; objections by other federal agencies [may] lead to successive reviews by the division engineer, the chief of engineers, and the Assistant Secretary of the Army." *Sierra Club v. United States Corps of Engineers*, 701 F.2d 1011, 1021 (2d Cir.1983). *See* 33 C.F.R. § 325.8.

10. The hearing on the motion for a preliminary injunction was originally scheduled for August 18, 1988. The defendants, without objection by plaintiffs, moved for a continuance, stating that no foreseeable harm would occur at least through September 11, 1988. In aid of its jurisdiction, the court stayed construction of the project pending a decision on the motion for preliminary injunction. In any event, no dredging can take place until October 31, 1988, due to a special restriction in the Corps permit. Corps permit, at 4–B.

ly to comments on the DEIS; (2) failing to make independent evaluation of the EIS, which was prepared by MDOT's consultants; (3) failing to obtain "conflict of interest" disclosure statements for certain MDOT contractors involved in preparation of the EIS; (4) failing to consider alternative means of providing employment in the Searsport area; (5) failing to give proper consideration to secondary impacts of the project; (6) improperly incorporating key documents by reference; and (7) failing to consider construction of a two-berth facility as an alternative.

The Corps is charged with noncompliance with NEPA by: (1) adopting an FEIS prepared by MDOT; (2) failing to make an independent evaluation of the EIS and of the information submitted by MDOT; (3) basing its permit decision on significant new information not part of the EIS; and (4) relying on studies and analyses conducted after the FEIS had been prepared.

## III. MOTION FOR PRELIMINARY INJUNCTION

In the First Circuit, a plaintiff must satisfy four criteria in order to be entitled to a preliminary injunction. The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981) (*quoting Women's Community Health Ctr., Inc. v. Cohen,* 477 F.Supp. 542, 544 (D.Me.1979) (Gignoux, J.)).

As concerns alleged NEPA violations, plaintiffs contend that the criteria for preliminary injunctive relief are to be applied less rigidly. In *Essex County Preservation Association v. Campbell,* 536 F.2d 956, 962–63 (1st Cir.1976), the First Circuit noted that in "certain 'exceptional cases,'" especially those involving "serious and *sub-*

*stantive* deficiencies in the EIS or equivalent study," "it is not necessary to balance the equities in issuing an injunction based on noncompliance with NEPA requirements." 536 F.2d at 962 (emphasis in original). Nevertheless, the court rejected the argument that a NEPA violation *per se,* regardless of its character, necessitates preliminary injunctive relief even in the absence of proof of irreparable harm. *Id.* And the court went on to state that, in the case of "'technical noncompliance' ... where the court found that the EIS was 'comprehensive,' 'well documented,' and covered 'all the environmental consequences ...,' ... it is not improper for a court to weigh competing considerations in deciding the appropriateness of injunctive relief." *Id.* at 962–63.

In a more recent NEPA case, *Commonwealth of Massachusetts v. Watt,* 716 F.2d 946 (1st Cir.1983), the government argued that, notwithstanding a NEPA violation (failure to file a supplemental EIS), there would be no irreparable injury to the plaintiff because oil exploration would not begin prior to a judicial resolution on the merits. The First Circuit responded that the government's argument ignored an important feature of NEPA.

> NEPA is not designed to prevent all possible harm to the environment; it foresees that decisionmakers may choose to inflict such harm, for perfectly good reasons. Rather, NEPA is designed to influence the decisionmaking process; its aim is to make government officials notice environmental considerations and take them into account. Thus, when a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered.

*Id.* at 952 (citations omitted). Thus, setting aside agency action after a full judicial review of the merits would not necessarily undo the harm to the administrative decisionmaking process; "[t]he agency as well as private parties may well have become committed to the previously chosen course of action, and new information—a new EIS

—may bring about a *new* decision, but it is that much less likely to bring about a *different* one." *Id.* (emphasis in original). By its decision in *Watt,* the First Circuit did not mean "to say that a likely NEPA violation automatically calls for an injunction; the *balance* of harms may point the other way." *Id.* (emphasis in original). However, a plaintiff seeking a preliminary injunction on the basis of an alleged NEPA violation "cannot be stopped at the *threshold* by pointing to additional steps between the governmental decision and environmental harm." *Id.* (emphasis in original).

The defendants argue that *Watt* has been undermined by the Supreme Court. In *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987), outer continental shelf [OCS] oil leases were challenged as having been issued without compliance with section 810 of the Alaska National Interest Lands Conservation Act [ANILCA], 16 U.S.C. § 3120. Speaking to the appropriateness of preliminary injunctive relief, the Supreme Court made clear that courts *"must* balance the competing claims of injury and *must* consider the effect on each party of the granting or withholding of the requested relief," 107 S.Ct. at 1402 (emphasis added), unless *Congress* has "foreclosed the traditional discretion possessed by an equity court ...," *id.* at 1403 n. 9 (emphasis added). Thus, when determining whether to issue a preliminary injunction, courts are to focus less "on the [ANILCA] statutory procedure ... than on the underlying substantive policy the process was designed to effect." *Id.* at 1403. The Court opined that the Ninth Circuit's position in *Amoco,* that " 'irreparable damage is *presumed* when an agency failed to evaluate thoroughly the environmental impact of a proposed action' ..., is contrary to traditional equitable principles.... The environment can be fully protected without this presumption." *Id.* at 1404.

*Amoco* relied on *Weinberger v. Romero-Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), which had reversed a First Circuit decision overturning a district court denial of injunctive relief against discharging Navy ordinance into coastal waters during weapons training. The district court had determined that there would be no appreciable harm to the environment from continued discharge of ordinance into the waters pending efforts by the Navy to obtain the required permit under the Federal Water Pollution Control Act [FWPCA], 33 U.S.C. § 1251 *et seq.* In reversing the district court, the First Circuit held that " '[w]hether or not the Navy's activities in fact harm the coastal waters, it has an absolute statutory obligation to stop any discharges of pollutants until the permit procedure has been followed, ...' " *Id.* at 311, 102 S.Ct. at 1802. Thus, the First Circuit seemed to be of the view that the equitable discretion of the district court to balance the competing interests of the parties had been curtailed. But the Supreme Court held that "[t]he integrity of the Nation's waters, ... not the permit process, is the purpose of the FWPCA," *id.* at 314, 102 S.Ct. at 1804, and thus the district court, absent a showing of injury to water quality, had not abused its equitable discretion by denying injunctive relief.

In *Watt,* the First Circuit distinguished *Weinberger* by noting that whereas the FWPCA "focuses upon the 'integrity of the Nation's waters, not the permit process,' ... NEPA does the converse." 716 F.2d at 952 (citing *Weinberger,* 456 U.S. at 314, 102 S.Ct. at 1804). It is impossible to escape the conclusion that *Amoco* severely undercuts the distinction attempted in *Watt.*

The statute at issue in *Amoco,* section 810 of ANILCA, 16 U.S.C. § 3120, is intended to "minimize adverse impacts upon subsistence uses and resources" resulting from the removal of Alaskan lands from federal ownership. *See* 16 U.S.C. § 3120(a)(3); *Amoco,* 107 S.Ct. at 1399. The Court went on the say that

Section 810 does not prohibit all federal land use actions which would adversely affect subsistence resources but sets forth a procedure through which such effects must be considered and provides that actions which would significantly restrict subsistence uses can only be undertaken if they are necessary and if the

adverse effects are minimized. *There is no clear indication in § 810 that Congress intended to deny federal district courts their traditional equitable discretion in enforcing the provision nor are we compelled to infer such a limitation.*

*Amoco,* 107 S.Ct. at 1403 (emphasis added). The Court observed that, "[l]ike the First Circuit in *Romero–Barcelo,* the Ninth Circuit erroneously focused on the statutory procedure rather than on the underlying substantive policy the process was designed to effect—the preservation of subsistence resources." *Id.* The Court made clear that absent a showing of irreparable injury to subsistence resources, a preliminary injunction would be inappropriate.[11]

Like section 810 of ANILCA, NEPA does not prohibit all undertakings significantly affecting the environment, but establishes a procedural framework in accordance with which significant environmental impacts and appropriate alternatives are to be considered. *See* 42 U.S.C. §§ 4332(C) & (E). Although the procedural component of the NEPA looms large, NEPA establishes " 'significant substantive goals for the Nation.' "[12] *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980) (*per curiam*) (quoting *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978)).

Moreover, as with section 810 of ANILCA, compliance with NEPA can be obtained "through the simple means of an order to the responsible federal official to comply," *Amoco,* 107 S.Ct. at 1403 n. 8. And, as with section 810, there is no clear indication in NEPA that "Congress intended to deny federal courts their traditional equitable discretion," *id.* at 1403.[13] The

**11.** Justices Stevens and Scalia, concurring in the judgment, were of the view that it was unnecessary to decide whether the Ninth Circuit had applied the proper standard for issuing a preliminary injunction because the Court had held that section 810 *did not apply* to the OCS. *See* 107 S.Ct. at 1409.

**12.** The substantive goals of the NEPA are set forth in 42 U.S.C. § 4331:

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) assure for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surroundings;

(3) attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

(c) The Congress recognizes that each person should enjoy a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment.

**13.** *Amoco* points to the Endangered Species Act as an example of a statute which *forecloses* the traditional equitable discretion of the federal courts. *See* 107 S.Ct. at 1403 n. 9 (citing *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978)).

First Circuit recognized in *Watt* that the balance of harms must be considered even in the face of a likely NEPA violation; that is, that a NEPA violation *per se* does not warrant an injunction. *Amoco* in turn appears to preclude preliminary injunctive relief predicated on a likely NEPA violation [14] unaccompanied by a showing of irreparable environmental injury. Of course, where there is a likelihood of irreparable environmental injury, it is still necessary to balance the competing harms, weigh the public interest, and consider the likelihood of success on the merits before determining the appropriateness of preliminary injunctive relief.

■ Under *Amoco* and *Watt* it now appears that:

1. all criteria for determining the appropriateness of extraordinary equitable relief, *see Bellotti, supra,* are to be weighed by the court, unless NEPA evinces a clear congressional intent to foreclose such discretion;

2. the finding of a likely violation of NEPA procedure, without more, raises no presumption of irreparable injury, nor does it diminish the need to determine the likelihood of irreparable environmental harm in the absence of preliminary injunctive relief;

 (a) where irreparable environmental harm is sufficiently likely, the court shall consider the remaining criteria for preliminary injunctive relief; [15] or

 (b) if no irreparable environmental harm is likely to result from the activity sought to be enjoined, the court should conclude, *see Bellotti, supra* at 1009 ("a plaintiff must satisfy four criteria in order to obtain a preliminary injunction"), that no preliminary injunctive relief may issue, *see also Amoco,* 107 S.Ct. at 1403.

■ There having been no attempt to demonstrate that NEPA evinces any congressional intent to foreclose exercise by the courts of their traditional equitable discretion, and the court being unable to discern such an intendment from the statute, the court turns to a consideration of the criteria for preliminary injunctive relief.

A. *Likelihood of Irreparable Environmental Injury*

■ Plaintiffs allege that two activities would cause irreparable injury: (1) construction of the causeway, and (2) dredging of the channel and the port terminal site. Once these habitats have been disturbed, the plaintiffs contend, "the damage cannot realistically be undone." MDOT concedes that construction of the causeway, which MDOT represents will take at least three months, and dredging of the pier area and the channel, which is already 60% completed, are the only phases of the project which could be accomplished pending a decision on the merits of plaintiffs' claims for permanent injunctive relief and declaratory relief.[16] In reliance upon these MDOT representations for present purposes, the court turns its attention to a consideration of the likelihood that irreparable environmental harm would result from construction of the causeway and dredging of the port terminal site.

The construction of the causeway involves filling 3.7 acres of intertidal wetlands with 15,000 cubic yards of material, *see* FEIS, at 4–8, 4–31, 4–43, 4–80, which would entail elimination of habitat used by shorebirds during seasonal migrations, FEIS, at 4–8; some temporary suspension of fill material during the six hours of daily contact with tidal water, FEIS, at 4–31; elimination of tidal exchange over gravel

---

**14.** The preliminary injunctive relief claims under § 404 of the Clean Water Act and § 9 of the Rivers and Harbors Act—the other statutes at issue in this case—require a showing of irreparable environmental harm even under the First Circuit's analysis in *Watt.*

**15.** As the Supreme Court stated in *Amoco,* "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long

duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." 107 S.Ct. at 1404.

**16.** MDOT further represents that, as distinguished from dredging, the filling of 25.1 acres of marine habitat in connection with the construction of the pier facilities will not be commenced until after the causeway has been completed.

bar, which is a minimal impact due to the normally low volume tidal exchange occurring over the bar in its natural state, FEIS, at 4–39—4–42; temporary destruction of substrate material for algae and benthic fauna, which will recolonize on the armor stone protection for the causeway, although in a reduced area, FEIS, at 4–47, 4–49; and possible loss of some soft-shell clam habitat, for which MDOT is constructing replacement habitat, FEIS, at 4–52; Corps permit, at 4.

The plaintiffs contend that these alterations constitute irreparable environmental injury. On the other hand, MDOT represents that the causeway can be removed and that the affected intertidal habitat can be restored if the Sears Island project is enjoined following a determination on the merits. See Affidavit of W. Reid, Jr., at ¶ 36 (Aug. 29, 1988) (stating, inter alia, that the causeway "could be removed ... and the original substrate type, elevation, and grade be reestablished.") [17] At the hearing, the plaintiffs responded to evidence and representations that environmental damage could be undone in this manner by noting that the area affected by the proposed causeway construction contains resources which are of at least regional and state significance,[18] and that proceeding with construction of the causeway pending a final decision on the merits would constitute foolhardy public policy.[19]

In the absence of any evidence that removal of the causeway is either impracticable or that it would not substantially restore the environmental status quo, the court concludes that the plaintiffs have failed to make a showing of irreparable environmental injury. See Amoco, 107 S.Ct. at 1404. There has been no challenge to the MDOT representation, upon which the court relies in its disposition of the motion for preliminary injunctive relief, that the removal of the causeway and the restoration of the affected habitat, with all their attendant costs, are nonetheless practicable.[20]

In contrast to the fill work required in the construction of the causeway, dredging of the pier area and channel may result in somewhat more permanent environmental alteration. The environmental impacts resulting from the proposed dredging activity would include increased turbidity of the water during construction, FEIS, at 4–27, clearly an impermanent impact; removal of habitat of certain aquatic organisms, which are likely to recolonize the affected habitat, at least in part, once dredging has been completed, FEIS, at 4–42, 4–43, 4–47, 4–49 —4–56; and impacts on marine life and water quality resulting from disposal of the dredged material at the approved disposal site off Rockland, FEIS, at 4–61—4–68. In addition, the FEIS and the construc-

**17.** Although the court does not consider the affidavits submitted by the parties as they pertain to the defendants' motion to dismiss, see Fed.R.Civ.P. 12(b), "submission of affidavits in support of or opposition to a preliminary injunction is both customary and appropriate." Bracco v. Lackner, 462 F.Supp. 436, 442 n. 3 (N.D.Cal.1978) (citing C. Wright and A. Miller, 11 Federal Practice and Procedure § 2949).

**18.** The intertidal habitat at the gravel bar along which the causeway to Sears Island would be constructed has been classified as borderline Class A—Class B habitat under the Penobscot Bay Conservation Plan [PBCP] prepared by the Maine Department of Inland Fisheries and Wildlife (December 1986). See Plaintiffs' Appendix, at 163.

According to the PBCP, Class A habitat should not be degraded through alteration or development of intertidal or submerged lands and should not experience any change in the type, or increase in the intensity, of existing uses. See

BPCP, at 24. Class B habitat should be maintained in sufficient quality and quantity to support all indigenous wildlife species and should not experience change in existing use, although an increase in the intensity of use is approved. See PBCP, at 25.

**19.** The public policy considerations are more appropriately addressed to Congress, which has not determined that risk to the environment warrants curtailment of the traditional equitable discretion of the federal courts in such matters. Compare note 13 supra. See also Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 107 S.Ct. 1396, 1402–04, 94 L.Ed.2d 542 (1987).

**20.** The court notes that the reparability of any environmental alterations may pertain as well to the supervening concern of the equity court that extraordinary injunctive relief is to be withheld where there is an adequate remedy at law. See Amoco, 107 S.Ct. at 1402–03.

tion permits contain environmental impact minimization procedures and conditions, as well as mitigation requirements. *See* Appendices "B" & "C".

The proposed dredging would be a resumption of the dredging activity which was suspended in consequence of the First Circuit decision that the earlier Corps permits were invalid. *See* 769 F.2d at 882. MDOT submits uncontroverted evidence that the area affected by the earlier dredging activity at the Sears Island site already has experienced recolonization by benthic fauna. *See* Affidavit of W. Reid, Jr., at ¶ 46 (Aug. 29, 1988). Additionally, the Corps permit itself prohibits dredging between July 1 and October 31, as a means of protecting the habitat of molting lobster. *See* Corps permit, at 4–B.

A resumption of dredging activity may effect some alteration of the ecosystem of Sears Island and its nearby environs. However, environmental change is not necessarily tantamount to injury, much less *irreparable* environmental injury. *See, e.g.,* Appendices B & C *infra.* In consideration of the seasonal restrictions imposed by the Corps on dredging activity, the minimal or impermanent nature of all of the environmental impacts, the demonstrated biologic recolonization of the same dredging area, the minimization requirements and the fact that all environmental impacts were considered by the Corps before permitting resumption of the dredging, the court concludes that the plaintiffs have made no showing of any likelihood of irreparable environmental injury from the proposed dredging.

## B. *Balance of Harms*

■ The defendants have shown that the delays occasioned by a preliminary injunction would entail substantial additional project costs, on a *monthly* basis (approxi-

mately $81,000), even "assuming [that] all projects fell into place without significant scheduling problems," Affidavit of R. Hunter, at ¶ 11 (Aug. 29, 1988). Where, as here, it has not been shown that irreparable environmental injury is likely to result, and the plaintiffs are financially unable to post security,[21] *see* Fed.R.Civ.P. 65(c), the substantial direct costs of delaying the project weigh heavily against plaintiffs and in favor of defendants.

Defendants assert that there are only two dipper dredges on the East Coast of the type required for this project. Although the Corps permit prohibits dredging prior to October 31, MDOT represents that it must make a commitment by October 1 in order to be assured the availability of a suitable dredge. Moreover, whatever increased costs would be occasioned MDOT by delays due to the unavailability of a suitable dipper dredge would likely go uncompensated were defendants to succeed on the merits.

The MDOT claim of lost business opportunities occasioned by project delay is somewhat more problematic, at least as concerns its quantification. Defendants cite *Half Moon Bay Fishermans' Marketing Association v. Carlucci*, 847 F.2d 1389 (9th Cir.1988), in which the Ninth Circuit found that the economic loss resulting from inability to accommodate a super containership by a specific date outweighed the environmental harm of dredging an adequate channel for the ship, even though the ship had not firmly committed to using the port if it were to be suitably dredged in a timely manner. *See id.* at 1397–98. The anticipated use of Sears Island by interested industrial customers and tenants, as well as shippers, is considerably more conjectural, there being no evidence of any firm commitment to construct any industri-

---

21. In determining whether to require a bond, the court must consider the possible loss to the enjoined party, the hardship that a bond requirement would impose on the movant, and the impact that a bond requirement would have on the enforcement of a right. *See Crowley v. Local No. 82, Furniture and Piano Moving, Furniture Store Drivers, Helpers, Warehousemen and Packers*, 679 F.2d 978, 1000 (1st Cir.1982),

*rev'd on other grounds*, 467 U.S. 526, 104 S.Ct. 2557, 81 L.Ed.2d 457 (1984). Although the present finding of no irreparable injury obviates consideration of the bond requirement in this case, the court notes that plaintiffs' financial inability to post security would increase the risk of loss to defendant MDOT, which is appropriately considered in weighing the competing harms.

al facility, and no specific port call date to which to relate the claimed costs of further project delays. Nevertheless, unless the court is to disregard, as unreliable, all of the evidence of likely future industrial development and port usage projected by consultants, MDOT, and various other agencies, it must be recognized that lost business opportunities, as well as the far less speculative loss of construction jobs and wages, will be a concomitant of further project delays, although the amount of such economic loss is impossible to forecast on the present record.

The injury to which plaintiffs point as a counterbalance to the economic harm to MDOT from further delay of the project is that plaintiffs would be unable to navigate their sailboats at high tide over the gravel bar along which the causeway would be constructed. The present record reveals sketchy, nonspecific evidence that plaintiff O'Neal has "frequently sailed ... in the area around Sears Island ... [and has] had occasion at high tide to sail across the bar between Stockton Harbor and Long Cove where the causeway is proposed to be constructed." [22] *See* Affidavit of W. O'Neal, at ¶ 3. The record further supports the related finding that lobster fishermen in the area avoid the bar even at high tide due to the danger of running aground on the bar. *See* Coast Guard Record of Decision, at 5.

### C. *The Public Interest*

■ As the defendants are federal and state agencies, the "public interest" inquiry relates closely to the "balance of harms."

As the Supreme Court has observed in a similar context,

> where an injunction is asked which will adversely affect a public interest for whose impairment, even temporarily, an injunction bond cannot compensate, the court may in the public interest withhold relief until a final determination of the rights of the parties, though the postponement may be burdensome to the plaintiff.

456 U.S. at 312–13, 102 S.Ct. at 1803 (quoting *Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed. 834 (1944)); *see also Amoco,* 107 S.Ct. at 1404. Given plaintiffs' inability to post meaningful security, the absence of any likelihood of irreparable injury to any plaintiff or of irreparable permanent injury to the environment they seek to protect, and, therefore, the absence of any significant basis for delaying a project which offers substantial local and state-wide economic benefits, the court finds that the public interest weighs heavily against preliminary injunctive relief.[23]

### D. *Likelihood of Success on the Merits* [24]

#### 1. Standing

■ The defendants forge a double-edged attack on plaintiffs' standing. First, the defendants contend that the plaintiffs fail the test enunciated in *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Second, the defendants argue more narrowly that the plaintiffs have no private right of action, under section 9 of the Rivers and Harbors Appropriations Act, 33 U.S.C. § 401 [RHA], to

---

**22.** The individual plaintiffs claim injury to their ability to sail around Sears Island, *see* Affidavit of W. O'Neal, at ¶ 4 (Sept. 8, 1988), and to the aesthetic appeal of views of Sears Island, the nesting habits of herons on Islesboro due to increased shipping traffic, and injury to the "undisturbed mood" of the Upper Penobscot Bay, *see* Affidavit of P. Tenney, at ¶¶ 2–4 (Sept. 8, 1988). Only the alleged injury to the plaintiffs' boating interest is threatened by construction work occasioned by the present denial of preliminary injunctive relief.

**23.** Plaintiffs point to a countervailing public interest in conforming official conduct with

NEPA procedures. But the Supreme Court, in *Amoco,* severely curtailed the public-interest weight to be accorded such considerations in cases involving violations of the procedures of such statutes as ANILCA and NEPA, unless accompanied by a sufficient showing of irreparable environmental harm. *See Amoco,* 107 S.Ct. at 1404.

**24.** Due to time constraints, and the fact that plaintiffs have been unable to satisfy the other criteria for preliminary injunctive relief, the court does not now consider the merits of plaintiffs' claims, except as to the issue of standing.

challenge the causeway permit issued by the Coast Guard.

In *Morton,* Sierra Club brought suit against the United States Forest Service for its actions in promoting a recreational development known as the Mineral King project. Like the present plaintiffs, Sierra Club had sought review under section 10 of the APA, 5 U.S.C. § 702, which affords a right of judicial review to "[a] person suffering legal wrong because of agency action within the meaning of the relevant statute...." 5 U.S.C. § 702. *Morton* held that the Sierra Club lacked standing. Although Sierra Club had alleged harm to cognizable interests—aesthetic and environmental well-being—it lacked standing because it failed to allege that it or its members would be affected in any of their activities by the project. *Morton,* 405 U.S. at 734–35, 92 S.Ct. at 1365–66. "Nowhere in the pleadings or affidavits did the Club state that its members use Mineral King for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents." *Id.* at 735, 92 S.Ct. at 1366 (footnote omitted).

The amended complaint alleges that "[m]embers of the Sierra Club use and enjoy the natural and recreational resources of the *Upper Penobscot Bay and Searsport area,* and their interests in these resources are being, and will be, adversely affected by the defendants' unlawful actions." Amended Complaint, at ¶ 7 (emphasis added). The individual plaintiffs in turn assert aesthetic and recreational interests in the Sears Island area, *see* Amended Complaint, at ¶¶ 8, 9; Affidavit of W. O'Neal (Sept. 8, 1988); Affidavit of P. Tenney (Sept. 8, 1988).[25] Specifically, plaintiff O'Neal attests that he has "frequently sailed on the waters of the northern Penobscot Bay in the area around Sears Island," has "had occasion at high tide to sail across the bar between Stockton Harbor and Long Cove where the causeway is proposed to be constructed," and that the causeway "will preclude [him] from navigating directly

from his mooring in Stockton Harbor to Long Cove and Searsport." Affidavit of W. O'Neal, at ¶¶ 3, 4. Plaintiff Tenney states that "[d]evelopment of the island will interfere with the natural beauty of the island which I have enjoyed for many years," that she has "boated around the island many times," and that she is "concerned about the possible change in the undisturbed mood of the Upper Penobscot Bay and interference with sailing activities caused by the development of Sears Island." Affidavit of P. Tenney, at ¶¶ 2–4.

The defendants contend that plaintiffs' allegations are too general and that the amended complaint should be dismissed for lack of standing. The defendants cite to *Wilderness Society v. Griles,* 824 F.2d 4 (D.C.Cir.1987), an action challenging a Bureau of Land Management decision to increase the acreage of federal land to be transferred from federal to state or native American ownership under the Alaska Native Claims Settlement Act and the Alaska Statehood Act. There the court held that Wilderness Society and Sierra Club members had insufficient standing to challenge a motion for summary judgment. *See id.* at 16–17. Although it was clear that additional federal lands were to be transferred, the plaintiffs had not identified any specific lands they wished to use which would be subject to the challenged transfer policy. *See id.* at 12. "[I]n order to show sufficient likelihood of injury, a plaintiff must adduce facts that reveal how his planned behavior will be injured by the challenged governmental action and third-party response." *Id.* at 15.

The present record may be similarly deficient. Although the two individual plaintiffs allege in general terms some past usage and enjoyment of Sears Island and its environs, there is no allegation that any plaintiff plans or intends to do so in the future. Moreover, there is no specific factual allegation or evidence as to the plaintiffs' past usage of the Sears Island area, such as would enable the court to make the

---

**25.** Although the amended complaint does not allege that the two individual plaintiffs are Sierra Club members, the original complaint and

the affidavits of the individual plaintiffs do so state.

essential determination "whether the plaintiff has ... shown that his intended behavior will be injured as a direct or indirect result of the challenged governmental action," *id.* at 12.

*Griles* noted the difference, delineated in *United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), between the showing of injury required to resist a motion to dismiss, as distinguished from a motion for summary judgment, on standing grounds. In *SCRAP*, the plaintiffs challenged railroad rate increases, alleging that the rate increases would result in decreased use of non-recycled raw materials and increased destruction of virgin timber, extraction of non-renewable resources, and disposal of recyclable materials, which in turn would cause injury to the plaintiffs because of higher consumer costs and lower enjoyment of their intended use of the forests, rivers, streams, mountains and other natural resources. *See* 412 U.S. at 680–81 n. 9, 93 S.Ct. at 2412 n. 9. Despite the railroads' contention that the plaintiff's could never prove causation and that their allegations were a ploy to avoid the need to show some injury in fact, the Court held that the plaintiffs' allegations were sufficient to withstand a motion to dismiss.

Of course, pleadings must be something more than an ingenious academic exercise in the conceivable. A plaintiff must allege that he has been or will in fact be perceptibly harmed by the challenged agency action, not that he can imagine circumstances in which he could be affected by the agency's action. And it is equally clear that the allegations must be true and capable of proof at trial. But we deal here simply with the pleadings in which the appellees alleged a specific and perceptible harm that distinguished them from other citizens who had not used the natural resources that were claimed to be affected. If, as the railroads now assert, these allegations were in fact untrue, then the appellants should have moved for summary judg-

ment on the standing issue and demonstrated to the District Court that the allegations were sham and raised no genuine issue of fact.

*Id.* at 688–89, 93 S.Ct. at 2416 (footnotes omitted).[26]

The *Griles* court harmonized the different results reached in *SCRAP* and *Morton.*

In *SCRAP*, the Court found that a complaint should not have been dismissed for lack of standing even though plaintiff had alleged injury only due to its members' use and enjoyment of natural resources "surrounding the Washington Metropolitan area." 412 U.S. at 678, 93 S.Ct. at 2411. The Court held that despite its lack of specificity, this allegation was enough to survive a motion to dismiss. The main thrust of the *SCRAP* opinion, however, was to distinguish *Sierra Club,* in which plaintiff had alleged a truly generalized interest in conservation and the environment. Plaintiff's allegation in *SCRAP* that its members actually used and enjoyed the natural resources in question brought it within the personal injury circumscription that the Court had delineated in *Sierra Club.* But in a critical footnote, the *SCRAP* court acknowledged that on a motion for summary judgment plaintiff might have had to show injury with greater specificity, *i.e.,* to name the specific forests that it uses and enjoys that would be affected by the challenged action. *Id.* at 689–90 n. 15, 93 S.Ct. at 2417 n. 15. And the Court has since reiterated that *SCRAP* indeed might have come out differently had it been decided on a motion for summary judgment. *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 45 n. 25, 96 S.Ct. 1917, 1927 n. 25, 48 L.Ed.2d 450 (1976). In sum, while a motion to dismiss may be decided on the pleadings alone, construed liberally in favor of the plaintiff, a motion for summary judgment by definition entails an opportunity for a supplementation of

**26.** In response to the railroads' objection that the allegations were too imprecise because "no specific 'forest' was named," the Court noted in *SCRAP* that the railroads could have moved for

a more definite statement under Federal Rule of Civil Procedure 12(e) or employed "normal discovery devices." 412 U.S. at 689–90 n. 15, 93 S.Ct. at 2417 n. 15.

the record, and accordingly a greater showing is demanded of the plaintiff. 824 F.2d at 16.

■■■ Under Federal Rule of Civil Procedure 12(b), if "matters outside the pleading are presented to and not excluded by the court, the motion [to dismiss] shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed.R.Civ.P. 12(b). At this juncture, looking only to the pleadings, the court must accept, as true, plaintiffs' allegations that they use and enjoy the natural and recreational resources in the vicinity of Sears Island and that plaintiffs' interests in those resources will be adversely affected by defendants' actions. Under *Morton—SCRAP—Griles*, these allegations are sufficient to resist defendants' motion to dismiss. The court is not satisfied that all parties have been afforded a reasonable opportunity to present all material pertinent to a motion for summary judgment on the ground of lack of standing.

Accordingly, plaintiffs' affidavits are excluded pending development of the record and the filing of an appropriate motion for summary judgment pursuant to Local Rule 19(b) (D.Me.1987). *See Griles*, 824 F.2d at 16–17. A scheduling order shall issue as soon as practicable, outlining pertinent issues relating to further litigation of the merits of all claims.

APPENDIX A

[From FEIS, at 4-2]

Figure 4.0-1. Preferred terminal designs at Mack Point and Sears Island.

## APPENDIX B

### CORPS PERMIT RESTRICTIONS AND MITIGATION REQUIREMENTS

The Corps permit contains the following special conditions:

1. Periodic maintenance dredging initially will be allowed for ten years, as required, upon 60 days notice to the Corps and receipt of written authorization. Dredged material must be disposed at an upland site; disposal in ocean waters or wetlands requires a separate permit.

2. Disposal of dredged material must be supervised by the Corps.

3. Disposal of dredged material at the Rockland site must occur at a specified buoy, and the scow must come to a complete halt prior to discharge.

4. The Coast Guard Marine Safety Officer must be notified prior to the start of the project.

5. Compliance with OSHA safety standards is mandated.

6. All wetlands disturbed during construction must be restored to their approximate original elevation and condition, and measures to protect wetlands and waterways from soil erosion runoff are to be implemented during construction.

7. Adequate sedimentation and erosion control devices are required during construction.

8. No temporary fill may be placed in water or wetlands, unless authorized. Any temporary fill which may be authorized shall be placed on geotextile fabric at the existing wetland grade and shall be completely removed and properly disposed of upon completion of the project. The temporary fill areas shall be restored.

9. A copy of the permit shall be present at the worksite.

10. Construction of 4.14 acres of replacement soft-shell clam habitat is required.

11. There must be construction of facilities capable of preventing the discharge of sediment, grease and oil associated with storm drainage into any waterway or wetland.

12. A five-year environmental study must be conducted on the environmental effects of the causeway.

13. No dredging is permitted from July 1 to October 31, in order to protect molting lobster and minimize other environmental impacts.

14. Disposal of dredged materials shall be avoided during the two-hour period of maximum flood-tide currents, and only one scow may discharge material at a time.

## APPENDIX C

### DREDGING IMPACTS

1. The initial two-berth phase of the project will require dredging of 45 acres of deepwater habitat.

2. Causeway construction impacts 1.6 acres of freshwater wetlands (which has already occurred), described as scrub-shrub wetland which previously may have provided habitat for shorebirds, waders, and waterfowl, Corps Compliance Review, at 4; it will also disturb 3.7 acres of intertidal habitat, which is soft-shell clam habitat, *but see* Appendix B, at ¶ 10.

3. Disposal of dredged material at the Rockland site will result in a dispersal 1,700 meters wide. The dredged material, consisting of glacial till, sand, silt and clay, was tested and found to be uncontaminated. Therefore, there will be no release of contaminants upon disposal. The water is 225 feet deep at the disposal site, and there is no stratification in the depth profile. The water at the disposal site is characterized by low turbulence and dispersion. Corps Compliance Review, at 5.

4. The Corps concludes that "[t]he temporary impacts from dredging and disposal were found to dissipate quickly," Corps ROD, at 26, which includes temporary increases in turbidity, Corps Compliance Review, at 3.

5. The Corps concludes that the tidal exchange affected by the causeway is 1–3% of the total tidal exchange between Long Cove and Stockton Harbor. Thus, any

changes in the chemical and physical characteristics of the area will be negligible. Corps ROD, at 27.

The FEIS contains the following additional specifics regarding dredging impacts:

1. While dredging is taking place, the amount of fine sediment in the water will increase noticeably in the vicinity of the scoop. However, the spoil material will be relatively cohesive and will settle quickly, thus minimizing dispersal. Although resuspension of bottoms materials may increase nutrient concentrations, the increase will be slight. FEIS, at 4-27—4-28.

2. Based on chemical analysis of the dredged material, no significant release of toxic organic compounds, pesticides or heavy metals is anticipated. FEIS, at 4-29.

3. The greatest concern during disposal of dredging spoils is turbidity. However, suspended sediment concentrations are likely to be near background levels within two hours of disposal. FEIS, at 4-30.

4. Impacts from placing fill material for the causeway will be minimized by using granular fill material containing very few suspendable fines and by placing filter fabric and protective armor stone. The filled material will not be exposed to water more than 50% of the time. FEIS, at 4-31.

5. During dredging and filling, the potential impacts on aquatic organisms are: (1) habitat removal; (2) changes in sediment type; (3) increased turbidity; (4) chemical contamination; (5) oxygen reduction; and (6) burial by suspended sediments.

6. Turbidity affects phytoplankton production, which can decrease primary productivity in the vicinity of dredging, but the prohibition of dredging during the peak period of phytoplankton productivity will minimize this impact. Impacts on zooplankton, whose feeding apparatus can clog during periods of high turbidity, will be minimized as well by the seasonal dredging restrictions. FEIS, at 4-46.

7. The benthic fauna which will lose habitat include blue mussels, periwinkle snails, and barnacles. FEIS, at 4-48.

8. The rock relief preferred by lobsters is virtually nonexistent around the Sears Island project site. The prime lobster areas are located south of the project site, and thus dredging impacts on lobster will be minimal. The prohibition against dredging between July 1 and October 31 further minimizes this impact. FEIS, at 4-53.

9. Finfish species will be temporarily disturbed and displaced during dredging, but will return. Suspended sediments can reduce fish egg hatching in the immediate vicinity. FEIS, at 4-53—4-54.

10. The nearest seal haulout ledge is one mile from the Sears Island site, too far away to be affected significantly. The lowest seal counts occur from October to May, thus the dredging impacts on seals will be reduced. FEIS, at 4-55.

11. Upland, near-shore and open-water disposal sites were considered. The upland alternative would be costly, would require a large amount of land, and the spoils would be of low utility as fill material because of the water content. Coastal disposal was rejected because costly dewatering of the materials would be required.

## ON MOTION FOR STAY

The plaintiffs move for a stay pending appeal of the order entered September 30, 1988. The state and federal defendants object.

The criteria for determining a motion for stay pending appeal parallel those applicable to a motion for preliminary injunction.

> [T]he applicable standards for a party seeking such a stay are 1) a strong showing that he is likely to succeed on the merits, 2) a showing that unless a stay is granted he will suffer irreparable injury, 3) a showing that no substantial harm will come to the other interested parties, *and* 4) a showing that a stay will do no harm to the public interest.

*Ainsworth Aristocrat International Pty. Limited v. Tourism Company of the Commonwealth of Puerto Rico,* 818 F.2d 1034, 1039 (1st Cir.1987) (emphasis in original; footnote omitted); *cf. Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st

Cir.1981) (criteria for preliminary injunction).

The court first examines the likelihood that plaintiffs will succeed on the merits of their appeal, bearing in mind that the plaintiffs would have to convince the First Circuit that the court's denial of preliminary injunctive relief was "clearly erroneous or clearly the result of an error of law." *Conservation Law Foundation of New England v. Andrus*, 623 F.2d 712, 714 (1st Cir.1979).

The plaintiffs' overriding contention is that the court wrongly invalidated the holding of *Commonwealth of Massachusetts v. Watt*, 716 F.2d 946 (1st Cir.1983). Their arguments are (1) that, unlike NEPA, *see Watt*, 716 F.2d at 952, the ANILCA statute at issue in the pivotal case of *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987), is substantive, not procedural, and thus that the focus in *Amoco* on substantive harm to the environment does not bear on *Watt*'s emphasis on harm to the NEPA process; and (2) that the First Circuit does not adhere to the Ninth Circuit's view, held erroneous in *Amoco*, that all that need be shown to obtain preliminary injunctive relief is a violation of the procedures mandated by an environmental statute. Rather, the plaintiff's contend, *Watt* reflects an appropriate balancing of harm to the NEPA process against harm to the defendants.

The plaintiffs are correct that the First Circuit has not abandoned the equitable requirement that the balance of harms and the public interest be considered even upon a showing of irreparable harm to the NEPA process. *See Watt*, 716 F.2d at 952. This court acknowledged as much in its earlier ruling, *see* pages at 894–895, and proceeded to address the likelihood of irreparable *environmental* harm, the balance of harms and the public interest, *id.* at 897–900. Plaintiffs present no new argument that the court's syndesis of *Amoco* and *Watt* was errant.

As to the likelihood of irreparable injury, the plaintiffs do not challenge the court's finding of no irreparable *environmental* harm, a finding which itself required denial of preliminary injunctive relief under the court's *Amoco/Watt* analysis. Rather, the plaintiffs rest on their contention that the alleged NEPA procedural violations are sufficient in themselves to mandate preliminary injunctive relief. Even assuming that harm to the NEPA process remains an appropriate consideration under *Amoco*, and that the alleged NEPA violations did occur, the court is unpersuaded that any such NEPA violations tip the equitable balance the other way absent any irreparable harm to the environment.

The court remains persuaded on the previous record that the defendants would sustain substantial injury should a stay issue pending appeal. But the state defendants now submit an affidavit attesting to daily costs of $55,000 in suspension-of-work expenses, and one-time remobilization costs of $350,000 should the work suspension extend for more than five days. *See* Affidavit of Michael J. Murray, ¶ 7 (Oct. 17, 1988). These substantial, and almost certainly unrecoverable,[1] costs of delay in the construction of portions of the project which themselves pose no significant risk of irreparable harm to the environment, increase the disproportionate harm which the defendants would sustain in the event of a stay pending appeal.

Finally, although a showing of significant harm to the NEPA process itself would weigh in favor of the plaintiffs' position with respect to the public interest should the plaintiffs prevail on appeal, in the absence of concomitant environmental harm it seems highly unlikely that the public interest would be better served by the delay of a public project offering substantial economic benefit with no significant permanent injury to the environment.

Accordingly, plaintiffs having failed to demonstrate irreparable environmental harm, or that either the balance of harms

1. Plaintiffs are unable to post any significant security.

or the public interest[2] favors a stay pending appeal, the motion is DENIED.

SO ORDERED.

## SUPPLEMENTAL MEMORANDUM

CYR, Chief Judge.

In its earlier ruling denying the request for preliminary injunctive relief, *see* 'Memorandum Decision on Motion for Preliminary Injunction,' due to time constraints the court did not consider one of the four criteria established by *Planned Parenthood League v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981). The court now undertakes to do so in the context of this supplemental memorandum, with a view to focusing further litigation of the merits of the four claims brought by the plaintiffs.

## I. PLAINTIFFS' RIGHT TO ASSERT VIOLATION OF RHA SECTION 9

### A. *Private Right of Action Under Section 9 of RHA*

The Supreme Court has held that no private right of action exists under section 10 of the River and Harbor Act (RHA). *California v. Sierra Club,* 451 U.S. 287, 294–95, 101 S.Ct. 1775, 1779–80, 68 L.Ed.2d 101 (1981). On that authority the Second Circuit correctly held, in *Sierra Club v. United States Army Corps of Engineers,* 701 F.2d 1011, 1033–34 (2d Cir.1983), that section 9 of the RHA likewise creates no private right of action.

### B. *Right of Action Under Section 10 of APA for Violation of Section 9 of RHA*

 Plaintiffs are proceeding not only against the alleged violator under section 9 of the RHA, but simultaneously under section 10 of the Administrative Procedure Act (APA), 5 U.S.C.A. § 702, against the permitting agency (i.e. the Coast Guard). The defendants argue that the plaintiffs lack standing under the APA to assert a violation of section 9 of the RHA, because plaintiffs' interests are not within the zone of interests protected by section 9 of the

RHA. *See Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970); *Save Our Wetlands, Inc. v. Sands,* 711 F.2d 634, 639 (5th Cir.1983). ("For [the plaintiffs] to have standing under APA Section 10, they must suffer injury in fact and the alleged injury must be to an interest arguably within the zone of interests to be protected or regulated by the statutes that the agencies were claimed to have violated.")

Defendants urge the court to accept the view that section 9 of the RHA was intended only to prevent the obstruction of interstate commerce in navigable waters, and not navigational interests of a recreational nature, or environmental interests. Defendants point to the Supreme Court's statement, in *California v. Sierra Club,* 451 U.S. at 295, 101 S.Ct. at 1780, that "the legislative history supports the view that the Act was designed to benefit the public at large by empowering the Federal Government to exercise its authority over interstate commerce with respect to obstructions on navigable rivers caused by bridges and other similar structures."

On the other hand, it does not appear that the quoted language from *California v. Sierra Club* was intended by the Court to exclude consideration of the environmental consequences of "obstructions on navigable rivers caused by bridges and other similar structures," *id.* Rather, as has been observed by the Fifth Circuit, the Coast Guard can deny a permit under section 9 on considerations of "conservation of natural resources, fish and wildlife, air and water quality, esthetics, scenic view, historic sites, ecology, and other public interest aspects of the waterway," *Zabel v. Tabb,* 430 F.2d 199, 214 n. 26 (5th Cir.1970) (*quoting* Our Waters and Wetlands: How the Corps of Engineers Can Help Prevent Their Destruction and Pollution, H.Rep. No. 91–917, 91st Cong.2d Sess. (1970)); *see also United States v. Cumberland Farms of Connecticut, Inc.,* 826 F.2d 1151, 1158 (1st Cir.1987) (noting regulation of pollu-

---

**2.** Due to time constraints, the court has not yet ruled on the likelihood of success on the merits, but is in the process of drafting a scheduling order focusing the further litigation of the merits.

tion under section 10 of the RHA by the Corps); *Save Our Wetlands*, 711 F.2d at 640. It has not been shown that the environmental consequences of the proposed Sears Island causeway are not within the zone of interests protected by section 9 of the RHA.

## II. MERITS OF THE RHA CLAIM UNDER COUNT I

■ Plaintiffs contend that the Coast Guard violated section 9 of the RHA, 33 U.S.C. § 401,[1] by issuing MDOT a permit to construct a causeway from Sears Island to Kidder Point without the consent of Congress. Congressional consent is required unless the causeway is "built under the authority of the legislature of [a] State across [a] river[ ] ... [or] other waterway[ ] the navigable portions of which lie wholly within the limits of a single State ...," 33 U.S.C. § 401. Plaintiffs assert that the proposed causeway would not cross "a river[ ] [or] other waterway[ ]" and that these particular waters are not "wholly within the limits of a single State."

Under the principle of *ejusdem generis*, plaintiffs argue that the generic term "waterways" must be read as akin to the more specific term "rivers" in the phrase "rivers and other waterways." The principle of *ejusdem generis* holds that "where general words follow an enumeration of specific items, the general words are read as apply-ing only to other items akin to those specifically enumerated." *Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 588, 100 S.Ct. 1889, 1895, 64 L.Ed.2d 525 (1980). Thus, plaintiffs contend that the waters between Sears Island and Kidder Point are not a waterway because those waters are not characteristic of a river. The Corps, on the other hand, defines "rivers and waterways" as "waterbodies" under 33 C.F.R. § 320.2(a), a less restrictive term than plaintiffs urge upon the court.

First, the court has difficulty with the premise of plaintiffs' argument, because it has not been made clear that the waters between Kidder Point and Sears Island do not have the characteristics of a tidal river.

More importantly, plaintiffs would appear to gain nothing by demonstrating that the terms "rivers and other waterways," appearing in the *second* sentence of section 401, do not apply to these waters. For if that is the case, it would seem that there is *no requirement of congressional consent* for construction of this causeway, under the *first* sentence of section 401. In other words, unless the terms "rivers and other [navigable] waterways" apply to these waters, or unless these waters are covered by the terms "port, roadstead, haven, harbor, canal, navigable river, or *other navigable water* of the United States," *see* section 401 (*emphasis added*),[2] section 401 would not

1. § 401. Construction of bridges, causeways, dams or dikes generally; exemptions
 It shall not be lawful to construct or commence the construction of any bridge, causeway, dam, or dike over or in any port, roadstead, haven, harbor, canal, navigable river, or other navigable water of the United States until the consent of Congress to the building of such structures shall have been obtained and until the plans for (1) the bridge or causeway shall have been submitted to and approved by the Secretary of Transportation, or (2) the dam or dike shall have been submitted to and approved by the Chief of Engineers and Secretary of the Army. However, such structures may be built under authority of the legislature of a State across rivers and other waterways the navigable portions of which lie wholly within the limits of a single State, provided the location and plans thereof are submitted to and approved by the Secretary of Transportation or by the Chief of Engineers and Secretary of the Army before construc-tion is commenced. When plans for any bridge or other structure have been approved by the Secretary of Transportation or by the Chief of Engineers and Secretary of the Army, it shall not be lawful to deviate from such plans either before or after completion of the structure unless modification of said plans has previously been submitted to and received the approval of the Secretary of Transportation or the Chief of Engineers and the Secretary of the Army. The approval required by this section of the location and plans or any modification of plans of any bridge or causeway does not apply to any bridge or causeway over waters that are not subject to the ebb and flow of the tide and that are not used and are not susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce.
 33 U.S.C.A. § 401 (1983).

2. *See* note 1 *supra*.

require congressional consent for the construction of this causeway.

Plaintiffs argue also that the waters between Sears Island and Kidder Point are not wholly within the State of Maine.[3] Seemingly to the contrary, in *United States v. Maine*, 469 U.S. 504, 513, 105 S.Ct. 992, 998, 83 L.Ed.2d 998 (1985), the Supreme Court held that "waters up to three miles seaward of the coastline are also within a State's boundary...." *Cf.* 43 U.S.C. § 1301(c). For present purposes, the court finds that the waters between Sears Island and Kidder Point "lie wholly within" the State of Maine.

It appears that the plaintiffs are not likely to succeed on the merits of their claim that the Coast Guard violated the APA by treating the waters over which the causeway is to be built as "a river[ ] [or] other waterway[ ] the navigable portions of which lie wholly within the limits" of Maine.[4]

## III. MERITS OF THE CWA CLAIM UNDER COUNT II

The gist of the Clean Water Act [CWA] claim is that the Corps improperly based its decision to grant a permit under CWA section 404, 33 U.S.C. § 1344, on MDOT's contention that a six-berth facility is the appropriate scale for use in evaluating practicable alternative sites for the project. Plaintiffs contend that realistic port usage projections suggest a need for no more than a two-berth facility. Plaintiffs therefore argue that Mack Point would offer a practicable alternative site for the port on the basis of any realistic cargo volume forecasts. In addition, plaintiffs argue that the Corps failed to make an independent review of the information prepared by MDOT and its consultants.

3. Plaintiffs cite to *The Passaic Bridges,* 70 U.S. (3 Wall.) 782, 16 L.Ed. 799 (1861), in which the Court, in finding that the Passaic River lies wholly within New Jersey, noted that the Passaic "is no highway to other States; no commerce passes thereon from States below the bridge to States above." 70 U.S. at 792. This language appears to evidence a focus primarily upon rivers running *between* states, rather than upon the coastal waterways of a single state. On the other hand, plaintiffs point out that it may be more reasonable to read the phrase: "rivers and other waterways the navigable portions of which lie *wholly within the limits of a state"*, as not including the

Section 404(b) of the CWA, 33 U.S.C. § 1344(b), requires that Corps permits for the discharge of dredged or fill materials into navigable waters be issued according to EPA guidelines published at 40 C.F.R. Part 230. These EPA guidelines state:

Except as provided under section 404(b)(2), no discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences.

(1) For the purpose of this requirement, practicable alternatives include, but are not limited to:

(i) Activities which do not involve a discharge of dredged or fill material into the waters of the United States or ocean waters;

(ii) Discharges of dredged or fill material at other locations in waters of the United States or ocean waters:

40 C.F.R. § 230.10(a)(1).

An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes. If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered.

40 C.F.R. § 230.10(a)(2).

Plaintiffs challenge the section 404 permit on the ground that the Corps failed to

navigable waters of Penobscot Bay leading to coastal and international waters through which interstate commerce flows.

4. Nor are plaintiffs likely to be able to show irreparable injury resulting from a violation of RHA § 9, inasmuch as this court is expressly empowered to order removal of the causeway under section 12. 33 U.S.C.A. § 406. *Cf. United States v. Cumberland Farms of Connecticut, Inc.,* 826 F.2d 1151 (1st Cir.1987) (upholding district court restorative order for violation of Clean Water Act).

make independent verification of MDOT's data concerning Mack Point as a practicable alternative port site. Plaintiffs rely on *Van Abbema v. Fornell,* 807 F.2d 633 (7th Cir.1986), which involved a challenge to a Corps permit for the construction of a coal transloading facility on the Mississippi River. The Seventh Circuit stated that, in conducting its public welfare review under 33 C.F.R. § 320.4(a) prior to issuance of a Corps permit,[5] "[t]he Corps certainly may utilize reports and facts derived from outside reports and sources ... but the Corps is responsible for the independent verification of specifically challenged information obtained from applicants or outside consultants." 807 F.2d at 639.

> Specific challenges to a report used by the Corps in its public interest review require specific responses or a determination that the report is not being relied upon in its challenged aspects.... When the Corps receives particularized objections to material upon which it importantly relied in its review, the Corps must undertake some *independent* effort to verify or discredit the challenged material.

*Id.* at 640 (*emphasis added*). *See also Friends of the Earth v. Hintz,* 800 F.2d 822, 834 (9th Cir.1986); *State v. Hudson,* 665 F.Supp. 428, 442 (E.D.N.C.1987).

The information on which the Corps relied in concluding that Mack Point is not a practicable alternative was prepared by MDOT and its consultants, and was specifically challenged by EPA and its consultant, TBS. Booz–Allen, MDOT's consultant, based projected cargo volumes for the proposed terminal on the assumption that vessel service, port costs, and ocean costs would be equal to those at competing ports. *See* Booz–Allen & Hamilton, Study of the Market Potential and Direct Benefits of New Port Development at Searsport, at 4, Plaintiffs' Appendix, at 245 (April 1987) (Booz–Allen Study). "Potential cargo was

defined as cargo that originates or is destined within the Searsport cost effective hinterland but is exported/imported via other U.S. and/or Canadian ports." Booz–Allen Study, at 6.

TBS raised specific challenges to Booz–Allen's assumptions. TBS concluded that "[b]ased on current and emerging economic and competitive trends within the New England region and the maritime industry it is unlikely [that the Booz–Allen assumptions] can be met in Searsport for containerized and breakbulk cargoes." TBS, A Review of Current and Future Dry Cargo Handling Capabilities at Mack Point, at 5, MDOT Appendix, at 423 (April 1987) (TBS Review). Although stated in general terms, this conclusion is followed by a more specific discussion of weaknesses perceived by TBS in Booz–Allen's assumptions. *See* TBS Review, at 5–7.

Under *Van Abbema* (the court is not aware of any First Circuit precedent), "[t]he Corps may rely on reports prepared by outsiders or applicants, but .. [ ] when such information is specifically and credibly challenged as inaccurate, the Corps has an independent duty to investigate." *Van Abbema,* 807 F.2d at 642. After requesting further clarification from MDOT and Booz–Allen regarding their assumptions, the Corps responded to the TBS objections by referring to existing or new information provided by MDOT and Booz–Allen. *See* Corps Record of Decision, at 20–21. For example, with respect to the TBS objections to Booz–Allen's comparison of operational costs of Sears Island and Mack Point, the Corps relied on a Booz–Allen market feasibility study and transportation costs analysis; with respect to the TBS contention that bogies could reduce handling limitations between shipside and backland storage areas at Mack Point, the Corps referred to Booz–Allen's conclusion that the use of bogies would require additional space and would result in slower and

---

**5.** The Corps considers the practicability of alternatives to dredging and filling activities as part of the public interest review mandated by 33 C.F.R. § 320.4(a). "For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit

would not comply with the [EPA's] 404(b)(1) guidelines." 33 C.F.R. § 320.4(a)(1). Review of project alternatives during the public interest review is further required under 33 C.F.R. § 320.4(a)(2)(i).

more expensive operations; in refuting the TBS conclusion that operational limitations would not render Mack Point impracticable, the Corps referred exclusively to Booz–Allen's conclusions regarding operational limitations; and with respect to the TBS forecast of cargo volumes which would be handled in the foreseeable future, the Corps relied on Booz–Allen's contrary projections, on Booz–Allen's belief that their forecasts are conservative, and on additional studies conducted by the state.

Although the Corps may *rely*, even exclusively, on information provided by MDOT and its consultants, *see Hintz*, 800 F.2d at 834, the parties should invite the court's attention to evidence of Corps efforts to *verify* Booz–Allen's and MDOT's assumptions and conclusions relating to the practicability of the Mack Point alternative, and evidence that the Corps itself analyzed or verified MDOT's and its consultants' data.[6]

 The Corps "may not reflexively rubber stamp" the information and conclusions of an applicant and its consultants. *Save Our Wetlands v. Sands*, 711 F.2d 634, 642 (5th Cir.1983). But the Corps may rely on, and even adopt, the work of a permit applicant as long as it independently reviews and verifies the work. Thus,

where the Corps spends considerable time reviewing the applicant's submissions, considers additional data from other sources, applies its own knowledge and expertise, and conducts its own independent field studies, a finding that an independent review and verification was conducted is likely warranted. *Id.* at 643.

Although the Corps appears to have spent considerable time addressing the objections of EPA, FWS and NMFS, and responding to the TBS challenges to Booz–Allen's assumptions, the parties should point out what actions were undertaken by the Corps as the predicate for its "deferral" to the professional judgment and expertise of MDOT and its consultants.

 The plaintiffs advance the related argument that the Corps should defer to EPA's conclusion that the Mack Point site is a practicable alternative. EPA's opposition to the Sears Island alternative is well-documented on the administrative record. *See* Plaintiff's Appendix, at 16–24, 32–42. EPA concluded that the Corps set out from the beginning to justify the Sears Island alternative, and to build a record against the practicability of the Mack Point alternative, by falsely inflating the proposed new port's growth potential,[7] hence the need for an expandable facility.

6. There is evidence that the Corps "deferred" to the professional judgment and expertise of MDOT's consultants. For example, the Corps ROD states: "In order to address the practicability of the Mack Point alternative, the Corps of Engineers requested a clarification of existing technical information contained in the record *from the applicant.* This information was prepared by the applicant's engineering consultants *who have years of experience in the area of port engineering and who are recognized experts in this field.*" Corps ROD, at 19. And the ROD later states: "The Corps of Engineers accepts the professional judgment of the State, FHWA and their consultants concerning the engineering and operational requirements of this project." Corps ROD, at 22. An internal Corps memorandum to defendant Rhen states:

The main issues revolve around differences of opinion between EPA's consultant and the State and their consultants. EPA refuses to recognize or accept the applicant's professional judgments. EPA's consultant questions the applicant's assumptions, operational requirements, and professional judgments about other non-practicable alternatives. We acknowl-

edge these professional differences of opinion, have addresses (sic) the Agencies' comments in the ROD, *and defer to the expertise of the State Director of Ports and his consultants.*

Memorandum from C. Godfrey to Col. Rhen (Feb. 17, 1988).

7. The EPA did not employ its most formidable weapon: its veto power over the project under 33 U.S.C. § 1344(c), which allows the EPA Administrator "to prohibit the specification of any area as a disposal site ... whenever he determines that the discharge ... into such area will have an unacceptable adverse effect on municipal water supplies, shellfish beds and fishery areas ..., wildlife, or recreational areas." 33 U.S.C. § 1344(c); *see also Bersani v. Robichaud*, 850 F.2d 36, 40 (2d Cir.1988). The EPA rarely uses its veto power under § 1344(c). Although the Corps processes approximately 11,000 permit applications annually, EPA has vetoed only five Corps permits. *Bersani*, 850 F.2d at 40.

The Corps public interest review regulations require that the Corps give full consideration to the views of the environmental agencies in deciding whether to issue a permit. 33 C.F.R. § 320.4(c). "Under these regulations the Corps is not bound to agree with the conclusions reached by these resource agencies, but simply required to listen to and consider their views in the decisionmaking process." *Sierra Club v. United States Army Corps of Engineers*, 772 F.2d 1043, 1054 (2d Cir.1985). Although the objections of EPA, FWS and NMFS to the project may have suggested a heightened duty on the part of the Corps to provide independent review and verification of the submissions of MDOT and its consultants, the Corps was well within its rights in rejecting demands to adopt the view of the EPA.

The plaintiffs argue also that the decision as to whether Mack Point is a practicable alternative should have been based on a consideration of the nonexpandable two-berth facility proposal for which the permit was granted, and not on a consideration of the six-berth facility envisioned at maximum build-out.

The Corps concedes that the aquatic resources adversely affected by development of the Sears Island terminal are more valuable than those at Mack Point. *See* Corps ROD, at 25. Thus, there is no dispute that EPA regulations require the Corps to deny the Sears Island permit if Mack Point is a practicable alternative. *See* 40 C.F.R. § 230.10(a)(1). The "practicability" determination, however, must be made in light of "cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(1).

The Corps describes the project as "[c]onstruction of a dry cargo terminal ... as part of a long range port development plan to meet the marine shipping needs of the State of Maine and the employment needs of the local area." Corps ROD, at 1. "The project purpose is to construct a modern port facility that is efficient and expandable to meet both current and future needs of the State." *Id.* at 17.

The parties should address whether under the CWA the "practicability" of an alternative is to be measured against these (or some other) general project goals, *see Van Abbema*, 807 F.2d at 638, or against the scope of the proposed project in its initial phase. *Cf. Roosevelt Campobello International Park Commission v. USEPA*, 684 F.2d 1041, 1046 (1st Cir.1982) (discussed *infra* with regard to consideration of "reasonable alternatives" under NEPA). Subsidiary issues which should be discussed include the extent to which it is the prerogative of the applicant to prescribe the type, dimensions and goals of the project to be *evaluated* under the CWA; whether, by proposing a two-berth facility, with the capacity for expansion to six berths, MDOT is entitled to have the Corps *evaluate* exactly that proposal under the CWA; or whether the Corps must evaluate the present and future economic assumptions, *inter alia*, upon which MDOT based its proposal, with a view to assessing their economic viability, thereby enabling the agency (and the reviewing court) to distinguish legitimate project typing and scoping from pretextual proposals designed to render otherwise "reasonable ("practicable") alternatives" unnecessary of consideration by the Corps under the CWA.

## IV. NEPA CLAIMS

The National Environmental Policy Act (NEPA) is a basic national charter for protection of the environment, 40 C.F.R. § 1500.1 (1987), which mandates "a rather finely tuned and 'systematic' balancing" of environmental considerations. *Calvert Cliffs' Coordinating Committee v. U.S. Atomic Energy Commission*, 449 F.2d 1109, 1113 (D.C.Cir.1971). *See also Silva v. Lynn*, 482 F.2d 1282, 1284 (1st Cir.1973). The Environmental Impact Statement (the EIS) is at the heart of the NEPA process. An "action-forcing" device, the EIS is designed to serve at least three purposes:

First, it permits the court to ascertain whether the agency has made a good faith effort to take into account the values NEPA seeks to safeguard. To that end it must "explicate fully its course of inquiry, its analysis and its reasoning." Second, it serves as an environmental

full disclosure law, providing information which Congress thought the public should have concerning the particular environmental costs involved in a project.
. . . .
[Therefore,] [i]t cannot be composed of statements "too vague, too general and too conclusory." ... [Third,] and perhaps most substantively, the requirement of a detailed statement helps insure the integrity of the process of decision by precluding stubborn problems or serious criticism from being swept under the rug. A conclusory statement "unsupported by empirical or experimental data, scientific authorities, or explanatory information of any kind" not only fails to crystallize issues, but "affords no basis for a comparison of the problems involved with the proposed project and the difficulties involved in the alternatives." ... Moreover, where comments from responsible experts or sister agencies disclose new or conflicting data or opinions that cause concern that the agency may not have fully evaluated the project and its alternatives, these comments may not simply be ignored. There must be good faith, reasoned analysis in response.

*Silva,* 482 F.2d at 1284 (citations omitted). *See Conservation Law Foundation v. General Services Administration,* 707 F.2d 626, 632 (1st Cir.1983).

Judicial assessment of NEPA compliance implicates both the substantive and the procedural aspects of the administrative action. *Grazing Fields Farm v. Goldschmidt,* 626 F.2d 1068, 1072 (1st Cir.1980). An administrative decision "may be set aside 'only for substantial procedural or substantive reasons mandated by statute.'" *Baltimore Gas and Electric Co. v. National Resource Defense Council,* 462 U.S. 87, 97, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983) (*quoting Vermont Yankee Nuclear Power Corp v. N.R.D.C.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460, (1978)).

▉ Substantively, the reviewing court must determine whether the agency action was "arbitrary, capricious [or] an abuse of discretion" under the Administrative Procedure Act (APA), 5 U.S.C. § 706(2)(A). *Sierra Club v. Marsh,* 769 F.2d 868, 871 (1st Cir.1985) (*Sierra Club I*). See also *Baltimore Gas & Electric,* 462 U.S. at 98, 103 S.Ct. at 2252. Judicial review is to be narrow in scope. The court is to determine whether the agency gave "good faith" consideration to the environmental consequences of the proposed action, but may not pass judgment on the balance struck by the agency. *Grazing Fields Farm,* 626 F.2d at 1072; *Roosevelt Campobello Int'l Park v. United States Environmental Protection Agency,* 684 F.2d 1041, 1045 (1st Cir.1982).

▉ The court must also evaluate the level of administrative compliance with the NEPA procedures. Because Congress has prescribed the procedures to be followed for the vindication of NEPA's substantive goals, the requirement of a properly detailed EIS is in no sense a pointless technicality, even where the agency in fact has considered the environmental factors in good faith. *Grazing Fields Farm,* at 1072–73. In the First Circuit, it is clear that only serious procedural violations warrant setting aside an EIS. *Concerned Citizens on I–190 v. Secretary of Transportation,* 641 F.2d 1, 3 (1st Cir.1981); *Essex County Preservation Ass'n v. Campbell,* 536 F.2d 956, 962–63 (1st Cir.1976).[8]

▉ Plaintiffs contend that the EIS process for the Sears Island project has been disrupted. They allege that the defendants violated NEPA's substantive goals by producing a FEIS which merely rationalized a decision made long ago, rather than one based on a "good faith consideration" of the environmental consequences. The defendants prepared a detailed 500–plus page EIS, well over the normal 300 pages suggested by the CEQ for complex EIS's. 40 C.F.R. § 1502.7 (1987). Many environmental studies were commissioned, including 16 in response to comments on the DEIS. FEIS, Vol. I, at ix–xi, 12–1 to 12–7 (general discussion of literature considered). Plain-

---

8. In *Conservation Law Foundation,* 707 F.2d at 632, the First Circuit evaluated NEPA procedural compliance under a "rule of reason" standard. How, if at all, this standard varies in application from the "arbitrary and capricious" standard is not clear.

tiffs nonetheless argue that the defendants failed to follow some of the NEPA regulations governing the content and preparation of an EIS,[9] and that the failure to do so, combined with the "track record of the defendants in dealing with the Sears Island project," demonstrates that the defendants violated their duty of good faith.

### A. *Use of Contractors*

Plaintiffs assert that preparation of the EIS did not meet the standards necessary to protect the "objectivity and integrity of the NEPA process," *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations,* 46 Fed.Reg. 18026, 18031 (1981) (*CEQ Forty Questions*);[10] specifically, plaintiffs challenge the involvement of Normandeau Associates, TYLIN/HBA, Olko Engineering and BAH.

Plaintiffs allege in their amended complaint three violations involving the alleged use of interested contractors in the preparation of the EIS. Plaintiffs argue that the FHWA did not select the contractors involved, that some of those involved in preparation of the EIS were not included in the list of preparers, and that no conflict-of-interest statements were obtained from the preparers, all in violation of 40 C.F.R. §§ 1506.5(c) and 1502.17.

**9.** Plaintiffs' contentions in these regards fall into four categories: (1) that the defendants failed to follow the proper procedures for employing contractors to prepare the EIS; (2) that the FHWA was insufficiently involved in the EIS process; (3) that the EIS inadequately discusses the secondary impacts of the project; and (4) that the EIS fails to discuss all reasonable alternatives.

In their supporting memorandum, however, plaintiffs did not pursue their contentions that the FHWA failed to respond adequately to comments on the DEIS, failed to prepare a Supplemental EIS addressing significant new information on the acreage requirements of a six-berth facility, and improperly incorporated key documents by reference. The plaintiffs failed also to focus on the allegations in the amended complaint that the Corps violated NEPA and its regulations, as well as the CWA, in accepting the FEIS and failing to require a supplemental EIS.

**10.** There is some apparent disagreement as to the deference to be accorded the *CEQ Forty Questions.* For instance, in *Cabinet Mountains*

The regulations clearly contemplate that the lead agency be *involved* in the process of choosing a contractor who prepares the EIS:

> It is the intent of these regulations that the contractor be chosen solely by the lead agency, or by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest.

40 C.F.R. § 1506.5(c) (1987). The lead agency "must select the consulting firm, even though the applicant pays for the cost of preparing the EIS." *CEQ Forty Questions,* 46 Fed.Reg. at 18033. The NEPA conflict-of-interest regulation requires that the EIS include a list of preparers, 40 C.F.R. § 1502.17 (1987), and the NEPA regulations require that those "preparing significant background papers" be included in the EIS list of preparers, 40 C.F.R. § 1502.17 (1987).

The list of preparers names only Normandeau Associates, Economic Research Associates (ERA), MDOT and FHWA. As defendants correctly note, however, the FHWA "approved" MDOT's contracts with Normandeau Associates and ERA, but did not approve MDOT's contracts with TYLIN/HBA, BAH, or Olko Engineering. Nor are the latter three consultants includ-

*Wilderness v. Peterson,* 685 F.2d 678, 682 (D.C. Cir.1982), the court considered that portion of the *CEQ Forty Questions* relating to mitigation measures. The court held that "the 'Forty Questions' publication ... is merely an informal statement not a regulation and we do not find it to be persuasive authority." In *Sierra Club I,* the First Circuit cited to various sections of the *CEQ Forty Questions* in interpreting NEPA and its regulations. *See Sierra Club I,* 769 F.2d at 870, 874, 877, 879 (including a citation to the section disapproved in *Cabinet Mountains Wilderness*). Although the D.C.Circuit distinguished *Andrus v. Sierra Club,* 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979), on the ground that it involved regulations which were subject to the notice and comment procedures, the Supreme Court noted that the CEQ was "created by NEPA and charged in that statute with the responsibility to 'review and appraise the various programs and activities of the Federal Government in light of the policies set forth ... in [the] Act," *id.* at 358, 99 S.Ct. at 2341. The Court found therefore that the "CEQ's interpretation of NEPA is entitled to substantial deference." *Id.*

ed in the list of preparers. The defendants contend that NEPA regulations do not require that these three consultants be listed because they did not *prepare* the EIS, but merely provided information to the EIS preparers. TYLIN/HBA, BAH and Olko Engineering all provided background reports for the EIS.[11] The parties have not discussed the procedural or environmental significance of the alleged failure to list these consultants as preparers, nor the importance of their input in the EIS process. Although further treatment of these matters may be warranted, for present purposes it appears highly unlikely that extraordinary equitable relief can be predicated on a failure to list these consultants as preparers, absent some showing of consequence to the integrity of the process or the environment. *See Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987).

The regulation governing the use of outside contractors requires also that the agency obtain disclosure statements from the preparers "specifying that they have no financial or outside interest in the project." 40 C.F.R. § 1506.5(c) (1987). The CEQ interprets the terms "financial or other interest ... broadly to cover any known benefits other than general enhancement of professional reputation." *CEQ Forty Questions*, 46 Fed.Reg. at 18031. The CEQ states that firms with interest in the out-

come of the project should be disqualified from participation in the EIS, while a disclosure statement in the DEIS "should clearly state the scope and extent of a firm's prior involvement" if the consulting firm was "involved in developing initial data and plans." *Id.*

The defendants argue that the failure to obtain conflict-of-interest statements was at most a "technical" violation of NEPA, with no resulting harm because neither Normandeau Associates nor ERA had an actual conflict of interest.[12] The defendants cite to affidavits executed by Dr. William Berry of Normandeau Associates and Frank Mahady of ERA. Other evidence in the record appears to contradict Dr. Berry's denial of a conflict of interest.[13] The exact nature and significance of any such conflicts of interest should be addressed by the parties.

## B. *FHWA Verification*

Plaintiffs challenge the adequacy of the guidance given MDOT in the preparation of the EIS. Plaintiffs argue that a particularly close evaluation of the EIS was called for because the firms involved in the evaluation of the Mack Point site may have had a conflict of interest. In *Essex County*, the First Circuit stated that "considerable caution should be exercised" when possibly-interested parties are involved in EIS

---

**11.** HBA prepared at least four reports, including a comparative analysis of the designs of dry-cargo terminals at Mack Point and Sears Island, and BAH prepared five reports, including a study of the effect the "no action" alternative would have on cargo volumes at Searsport and the state in general. EIS, Vol. I, at 12–6, 12–2, and x. TYLIN/HBA also organized the strategy for responding to comments to the DEIS. Although discounted by the MDOT because no actual writing or editing was involved, TYLIN/HBA was responsible for coordinating the response to the DEIS comments, including identifying the important issues and assigning the follow-up research. Olko Engineering's level of participation is somewhat less clear. But they served, at a minimum, on the EIS review team and were involved in answering the questions of the Corps.

**12.** Defendants argue also that this regulation only applies to those highly unique situations in which a contractor independently prepares an EIS for the state which the state in turn adopts

as its own. The MDOT cites the FHWA Director of Environmental Policy for authority on this point, but provides no other authority for so narrowly construing this section. Plaintiffs argue that such a unique situation may never exist, because NEPA, when delegating the responsibility for preparation of the EIS to a preparer outside the agency, requires the delegating agency to guide the outside preparer and to participate in the EIS process.

**13.** The record indicates that on July 15, 1983, a document titled "Sears Island Maine Dry Cargo Searsport, Maine, Vol. I Preliminary Design Report" was prepared for MDOT by Hunter–Ballew Associates "in association with" Olko Engineering and Normandeau Associates. (Plaintiffs' Appendix, at 192). The plaintiffs also cite to the November 1983 environmental assessment (EA) summary prepared by these consultants, which identified Sears Island as the preferred alternative. Plaintiffs' Supplemental Appendix, at 9.

preparation. *Essex County*, 536 F.2d at 960. *See also Sierra Club v. Sigler*, 695 F.2d 957, 963 (5th Cir.1983) (use of EIS preparers involved in the design of the favored alternative described as "troubling"; the court should carefully review to be sure the agency did not "rubber stamp" the EIS.)

NEPA provides that a federal agency may delegate preparation of an EIS to a state agency only if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation,

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(vi) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written, assessment of such impacts and views for incorporation into such detailed statement.

42 U.S.C. § 4332(2)(D) (1982). The regulations go on to say that "[i]t is the intent of this paragraph that acceptable work not be redone, but that it be *verified* by the agency." 40 C.F.R. § 1506.5(a) (1987) (*emphasis added*).

The defendants argue that the level of FHWA review at least matched that considered adequate by the First Circuit in *Essex County*. However, *Essex County*, as well as the other cases relied on by the defendants,[14] either were decided prior to the promulgation of the regulation requiring *verification*, or relied on preregulation cases without considering the effect of the new requirement.

Four federal courts, the Second, Fifth and Ninth Circuits, and the U.S. District Court for the District of Columbia, have addressed what agency action is required to verify outside work. *See Friends of the Earth v. Hintz*, 800 F.2d 822 (9th Cir.1986) (construing the Corps regulation requiring verification); *Save Our Wetlands v. Sands*, 711 F.2d 634 (5th Cir.1983) (same); *Sierra Club v. United States*, 701 F.2d 1011 (2d Cir.1983) (same); *Foundation on Economic Trends v. Lyng*, 680 F.Supp. 10 (D.D.C.1988) (construing NEPA verification requirements).

In *Hintz*, the Corps "requested reports and supplemental reports from [the applicant], consulted various federal and state resource agencies [and] requested additional supplemental reports." The *Hintz* court held that the Corps, which "is not a business consulting firm," is not required to conduct its own study of alternatives, but is required to study the information provided by the applicant, and to seek "the expert views of resource agencies involved," *Hintz*, 800 F.2d at 835–36.

In *Sands*, Corps personnel reviewed the information submitted by the applicant, studied data from the area, and sought staff biologist review. The Corps conducted its own investigation concerning the effects of electrical transmission lines on wildlife and studied the effects of the project on Southern bald eagles. Corps personnel also flew over the area. The court held that "the evidence that the Corps reviewed, verified, and supplemented the consultant's reports is sufficient to fulfill the Corps' obligations under federal regulations." *Sands*, 711 F.2d at 643.

In *Lyng*, the U.S. District Court for the District of Columbia found that the agency met its duty of independent verification by "conduct[ing] independent statistical analysis of raw data, specify[ing] testing protocol, and submit[ting] certain materials to the National Veterinary Services Labo-

---

**14.** *Conservation Society v. Secretary of Transportation*, 531 F.2d 637, 639 (2d Cir.1976); *Lange v. Brinegar*, 625 F.2d 812, 818–19 (9th Cir.1980) (analyzing a 1972 EIS with a 1975 supplement);

*Friends of Endangered Species v. Jantzen*, 596 F.Supp. 518, 526–27 (N.D.Cal.1984) (relying on pre–1979 cases without considering new regulation).

ratory for confirmation." *Lyng*, 680 F.Supp. at 15 n. 4.

The record indicates that FHWA personnel participated in the preparation of the EIS. Defendant Richardson met with representatives of MDOT, the Coast Guard, and the Corps to "discuss EIS preparation and permitting procedures." MDOT Appendix, at 15. The FHWA approved the use of ERA and Normandeau Associates, the only consultants regarded as "preparers." FHWA representatives participated in the "scoping" procedure. Federal Defendants' Appendix, at 3–21. FHWA representatives met with MDOT and Corps personnel to discuss the draft outline. Federal Defendant's Appendix, at 25. FHWA representatives met also with MDOT personnel throughout the process, to monitor the progress of the EIS and to provide input. *Id.* at 30–33, 35–39, 55–57. Defendant Richardson (FHWA Division Administrator) toured Mack Point with MDOT and federal officials as part of their consideration of Mack Point as an alternative site. MDOT Appendix, at 89–92. FHWA "specialists" reviewed both the DEIS and the FEIS to insure compliance with the applicable laws. *See, e.g.*, Federal Defendants' Appendix, at 33, 57. Defendant Richardson circulated the FEIS, with detailed responses to comments received on the DEIS.

The parties should address the respects in which the FHWA failed (or not) in its duty of independent verification of the EIS in the circumstances of this case.

C. *Secondary Impacts*

■ Plaintiffs challenge the adequacy of the FEIS discussion of the secondary impacts of the Sears Island project. Concerns over the secondary impacts of the project are not new to this litigation. In *Sierra Club I,* the First Circuit required that an EIS be prepared because the Corps EA "fail[ed] to consider adequately the fact that building a port and causeway may lead to further industrial development of Sears Island and that further development will significantly affect the environment." 769 F.2d at 877. The Corps concluded that,

"because the secondary development being considered is 'light dry industrial[,] there should be no significant air or water quality impacts from this type of industrial operation.' " *Sierra Club I,* 769 F.2d at 881. But the First Circuit found that this conclusion was not "supported or explained, nor [did] the record indicate why this [was] so." *Id.* at 881.

The present FEIS devotes 47 pages to a discussion of the proposed industrial park as a secondary project impact. FEIS, Vol. I, at 4–108 to 4–154. The secondary impact analysis is based on assumptions about the scale of the development, the phasing of the development, the commuting distance of the industrial employees, and the types of industry expected to locate in the industrial part. The four industry types assertedly targeted for the proposed industrial park adjacent to the port terminal are: fabricated metal products; non-electrical machinery and equipment; electrical and electronic machinery and equipment; and transportation equipment. FEIS, Vol. I, at 4–109, 4–130. The FEIS environmental analysis is predicated on the assumption that "these industries would not be expected to have large steam demands; combustion of fuels would be primarily for space heating, and that the "industries targeted would ... [not] have major water use and discharge requirements." FEIS, Vol. I, at 4–117, 4–120.

Plaintiffs find two faults with the FEIS secondary impact analysis. First, they argue that the FEIS does not include sufficient documentation of the assumption that only the four targeted "light" industries will locate at the industrial park. The assumption regarding these four types of target industry is predicated on the 1983 Municipal Response Plan For the Industrial Development of Sears Island (Mallar Report), prepared by Mallar Development Services for the Town of Searsport. The parties should discuss in detail the adequacy of the bases for all of the assumptions underlying the secondary impact analysis in the EIS.

Plaintiffs argue also that the EIS neglects to discuss the possible impacts of

"heavy industry," which plaintiffs suggest is a reasonably foreseeable development.[15] Plaintiffs point to earlier proposals for developing Sears Island, and to existing development plans for the *Searsport area,* as evidence of the foreseeability of "heavy industry" development. Plaintiffs point to the following FEIS information as evidence that heavy industry is likely to be located in the Sears Island industrial park: (1) Table A–2 states that Searsport is "one of two areas recommended for 'cluster development' of heavy industry;" (2) page 2–3 states that the Advisory Committee on Coastal Development and Conservation has "recommended that heavy industry be located *either* in the Portland–South Portland area or the Searsport–Stockton Springs–Penobscot area *(emphasis added);*" and (3) a September 2, 1986 letter from the State Development Office commenting on the number of surveys which have been conducted on the land use plans and secondary impacts of the Sears Island project and noting that "the park is intended for heavy industry." FEIS, Vol. II, at S–2.

Other portions of the record mention existing studies, or earlier plans for the development of Sears Island, which discuss location of heavy industry in the area. The FEIS notes that previous development proposals include a nuclear or coal-fired power plant or an aluminum smelter.[16] FEIS, Vol. I, at 4–109; *Sierra Club I,* 769 F.2d at 872. The FEIS discusses the Coastal Conservation and Development Committee recommendations for cargo port development and heavy industry location. FEIS, Vol. I, at A–5. These recommendations are con-

sidered "essentially a preliminary master plan for the coastal zone of Maine." *Id.* One MDOT criterion for determining the preferred location of the cargo terminal was compatibility with the Coastal Committee recommendations.

NEPA regulations require that the EIS identify all indirect impacts *known* or *"reasonably foreseeable".* 40 C.F.R. § 1508.8(b) (1987). Although "the agency is not required to engage in speculation," appropriate inquiry and investigations may include "likely purchasers [of land] and development trends in the area or similar areas in recent years." *Sierra Club I,* 769 F.2d at 879 (quoting *CEQ Forty Questions,* 46 Fed.Reg. at 18031). From the FEIS it appears that the MDOT and FHWA were aware of existing studies and previous plans for Sears Island and the Searsport area which at least considered heavy industrial development for the area.

The parties should discuss in detail whether or not the agency decision to evaluate the environmental impact of only the four target industries in the Sears Island industrial park was "arbitrary or capricious."

### D. *Reasonable Alternatives*

Plaintiffs argue also that the FEIS fails to discuss all reasonable alternatives. Plaintiffs point in particular to an alleged need to consider methods for stimulating the economy of Waldo County, other than by means of a dry cargo terminal, and an alleged need to consider the construction of a nonexpandable two-berth facility.[17]

---

**15.** Plaintiffs challenge only the types of industries evaluated in the EIS. They do not appear to argue that the EIS inadequately evaluates the impacts of the industries actually discussed.

**16.** The FEIS excludes these industries from its analysis of the environmental impacts of secondary development for the following reasons: (1) the proposals relate to past plans and are unrelated to the present project; (2) the "scale of these sorts of investments would dwarf the cost of the preferred alternative and therefore proceed independently;" and (3) the present action would not "preclude separate environmental review should such large scale projects be-

come feasible sometime in the future." FEIS, Vol. I, at 4–109 to 4–110.

**17.** Plaintiffs suggest that the FEIS should discuss industrial parks, governmental subsidies, and inland development projects as alternatives to the port project. FEIS, Vol. II, at F–5; Plaintiffs' Appendix, at 223–24. According to the FEIS, the Sears Island project has two goals: (1) to improve the efficiency of Maine's transportation system by creating a modern port facility and (2) to create jobs in an economically depressed area. Plaintiffs have not suggested even a facially plausible alternative for improving the economy of Waldo County that would meet *both* of the goals of the project planners.

■ Under NEPA, federal agencies are required to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative use of available resources," 42 U.S.C. § 4332(2)(E) (1982), even if an EIS is not required. If an EIS is required, the agency must prepare a *detailed statement* considering the environmental consequences of the proposed action. 42 U.S.C. § 4332(2)(C) (1982). Alternatives to the proposed action must be included in the EIS. 42 U.S.C. § 4332(2)(C)(iii) (1982). Consideration of alternatives is "the heart of the environmental impact statement."[18] 40 C.F.R. § 1502.4 (1987).

The NEPA regulations provide the following guidance with respect to the EIS discussion of reasonable alternatives:

Based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16), [the EIS] should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

40 C.F.R. § 1502.14 (1987). In addition, the agency is to adopt procedures for

requiring that the alternatives considered by the decisionmaker are encompassed by the range of alternatives discussed in the relevant environmental documents and that the decisionmaker consider the alternatives described in the environmental impact statement. If another decision document accompanies the relevant environmental documents to the decisionmaker, agencies are encouraged to make available to the public before the decision is made any part of that document that relates to the comparison of alternatives.

40 C.F.R. § 1505.1 (1987).

The Supreme Court has spoken in broad terms about the need to discuss alternatives in the EIS.

As should be obvious even upon a moment's reflection, the term "alternatives" is not self-defining. To make an impact statement something more than an exercise in frivolous boilerplate the concept of alternatives must be bounded by some notion of feasibility. As the Court of

---

18. Consideration of alternatives under NEPA is different than under the CWA. Under the CWA, consideration of "practicable alternatives" is mandated by EPA wetlands regulations promulgated pursuant to the Act. 40 C.F.R. § 230.10(a) (1987). The criteria for determining whether an alternative is practicable under the EPA wetlands regulations are similar to the factors for determining whether an alternative is reasonable under NEPA; consideration of cost, existing technology, and logistics in light of overall project purposes would seem to be required under both. *Compare* 40 C.F.R. § 230(a)(2) (1987) *with CEQ Forty Questions,* Fed.Reg. at 18026, *and Roosevelt Campobello,* 684 F.2d at 1047. The effect of the determination, however, is different under the two acts. Under NEPA, a determination that an alternative is reasonable requires that the agency examine fully the environmental impacts of that alternative in the EIS, even though the alternative may ultimately be rejected. Under the EPA wetlands regulations, a determination that an alternative is practicable requires the agency to select that alternative over any other, including a preferred alternative, which would have greater adverse impact on the aquatic ecosystem, so long as the "practicable alternative" does not have other significant adverse environmental consequences. For more detailed evaluation of the CWA, *see* Part III *supra.*

Appeals for the District of Columbia Circuit has itself recognized:

> "There is reason for concluding that NEPA was not meant to require detailed discussion of the environmental effects of 'alternatives' put forward in comments when these effects cannot be readily ascertained and the alternatives are deemed only remote and speculative possibilities, in view of basic changes required in statutes and policies of other agencies—making them available, if at all, only after protracted debate and litigation not meaningfully compatible with the time-frame of the needs to which the underlying proposal is addressed." *Natural Resources Defense Council v. Morton,* 148 U.S.App.D.C. 5, 15–16, 458 F.2d 827, 837–838 (1972).

See also *Life of the Land v. Brinegar,* 485 F.2d 460 (CA9 1973), cert. denied, 416 U.S. 961 [94 S.Ct. 1979, 40 L.Ed.2d 312] (1974). Common sense also teaches us that the "detailed statement of alternatives" cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man. Time and resources are simply too limited to hold that an impact statement fails because the agency failed to ferret out every possible alternative, regardless of how uncommon or unknown that alternative may have been at the time the project was approved.

*Vermont Yankee,* 435 U.S. at 551, 98 S.Ct. at 1215.

■ In the First Circuit there are three requirements to "preserve an alternatives issue for review." *Roosevelt Campobello,* 684 F.2d at 1047. *First,* the alternative must either appear reasonable and appropriate at the time the EIS was drafted or have been suggested during the comment period. *Id. Second,* the intervenor must make more than a "facially plausible suggestion, rather [he] must offer tangible

evidence that an alternative [ ] might offer a 'substantial measure of superiority'" to the preferred alternative. *Id.* at 1047 (quoting *Seacoast Anti–Pollution League v. NRC,* 598 F.2d 1221, 1228 (1st Cir.1979)). *Third,* the suggested alternative must be reasonable, given the primary objectives of the project applicant. *Roosevelt Campobello,* 684 F.2d at 1047.

The CEQ narrowly construes the primary objectives of a project applicant. Reasonable alternatives are those "that are practical or feasible from the technical and economic standpoint and using common sense rather than simply *desirable* from the standpoint of the applicant." [19] *CEQ Forty Questions,* Fed.Reg. at 18026 (*emphasis added*). In the First Circuit economic concerns are recognized as important in defining the primary objectives of the applicant. *Roosevelt Campobello,* 684 F.2d at 1047; *Silva,* 482 F.2d at 1287.

In *Roosevelt Campobello,* the First Circuit viewed the primary objectives of the proposed oil refinery project as "a port with deep water near shore in order to accommodate [oil supertankers]." 684 F.2d at 1047. The refinery would not have been economically feasible if it could not take advantage of the economies of scale available with supertankers. Therefore, limiting the alternatives discussed to those areas with deep water access met the duty to consider all alternatives "reasonable and appropriate." *Id.*

In *Silva,* 482 F.2d at 1287, the First Circuit discussed the economic feasibility of a suggested alternative and the balancing of the project needs vis-a-vis the environmental consequences. There the court stated that

> It is not too much to require an *explanation* why a lesser aggregation of housing units on the property would be either economically unsound or, as a policy matter, would represent less of a benefit in

---

**19.** The Fifth Circuit defines reasonable alternatives as follows:

> At the outset we note that the evaluation of "alternatives" mandated by NEPA is to be an evaluation of alternative means to accomplish the *general* goal of an action; it is not an

evaluation of the alternative means by which a particular applicant can reach his goals. In the current proposal the general goal is to deliver coal from mine to utility.

*Louisiana Wildlife Federation v. York,* 761 F.2d 1044, 1048 (5th Cir.1985).

terms of low and middle cost housing needs than would be justified by the costs associated with the disadvantages to the environment.[20]

(*Emphasis added.*)

Plaintiffs argue that the FEIS should have evaluated the alternative of constructing a nonexpandable two-berth facility.[21] The comment was clearly presented in a timely fashion. FEIS, Vol. II at P–14; Letter from Elizabeth Higgens of the EPA, Plaintiffs' Appendix, at 205. The defendants argue that the proposal of a two-berth facility as a "reasonable alternative" distorts the scope of the project proposed by the applicant. The Corps considers the project applied for as "an initial 2 berth facility (Phases 1 and 2) with expansion *potential* to a six berth future facility (Phases 3 and 4)." Corps ROD, Federal Defendants' Appendix, at 202 (*emphasis added*). The EIS describes the project as having two goals:

> The proposed general cargo terminal at Sears Island comprises one component of the State of Maine's larger strategy to improve the efficiency of its transportation system through selected infrastructure and other investments, consistent with the State's goals of preserving and enhancing its invaluable environmental resources. This strategy is intended to ensure the long term viability and expansion of the State's economy, especially in specific regions where chronic unemployment and underemployment warrant public action to help mitigate social disadvantages.

FEIS, Vol. I, at 1–1. The defendants maintain that an important objective of the project is construction of a facility expandable so as to accommodate the projected growth of marine traffic at the terminal. They do not consider a two-berth facility capable of meeting this goal.

Plaintiffs argue that the two-berth alternative is reasonable because sufficient information exists to indicate that a six-berth facility may not be necessary or even economically feasible. Plaintiffs point to the TBS cargo projections, which conclude that the BAH cargo estimates are flawed in that they rely on unsupportable assumptions. Even if the BAH cargo estimates are accurate, plaintiffs submit that a two-berth facility could handle high cargo estimates through the year 2010. Plaintiffs also characterize the chances of the cargo facility ever achieving full buildout as "totally speculative," noting that funding for

---

**20.** The *CEQ Forty Questions* supports the *Silva* holding. Where a comment to the DEIS raises "an alternative which is a minor variation of one of the alternatives discussed in the draft EIS but not given any consideration by the agency," the agency "*should* develop and evaluate the new alternative, if it is reasonable, in the final EIS." *CEQ Forty Questions,* 46 Fed.Reg. 18035 (*emphasis added*). However, the agency would not be required to circulate a supplemental DEIS for an alternative qualitatively within the spectrum of alternatives already discussed. One of the examples was a DEIS for an urban housing project, which discussed alternatives of constructing 2,000, 4,000 or 6,000 units, where a commentator suggested consideration of 5,000 units in a different configuration.

**21.** There is disagreement as to whether the two-berth alternative is discussed in the FEIS. Plaintiffs note that one reason for rejecting Mack Point as an alternative site was that Mack Point was a less suitable location for a six-berth facility. The FEIS section on "comparison of alternatives is limited to the impacts associated with the full build out of Mack Point, Sears Island and Long Cove." FEIS, Vol. I, at 2–7.

The section evaluating the environmental consequences of the different sites states, "[in] all cases impacts relate to the full development of the terminal unless specifically stated otherwise." FEIS, Vol. I, at 4–1. The state defendants argue that a two-berth facility was considered, but that the consideration focused on a two-berth facility with certain characteristics, most notably its expandability to six berths. MDOT noted that although the CEQ regulations provide "that 'connected' and/or 'cumulative' actions should be considered in one impact statement" they considered it "unclear whether the agencies would have been *required* to consider the environmental impact of the full, six-berth project." Therefore, MDOT argues that the discussion of the environmental effects of the full build-out exceeded NEPA requirements. The federal defendants did not address this point, focusing instead on the unreasonableness of the plaintiffs' proposed alternative. The federal defendants argue that the two-berth proposal was not reasonable "in light of the purpose described by the applicant."

the third berth and beyond has yet to be approved.

■ The role of the court is not to determine which expert to believe, TBS or BAH, but rather to determine whether the decision to discuss only the two-berth expandable facility was too unreasonable to permit it to stand. A port project, like a highway, airport, or other infrastructure improvement, is designed to meet the needs of the state well into the future. In this situation, the capacity to expand may be analogous to the need for deep water in *Roosevelt Campobello*. The parties should address whether, under NEPA, the reasonableness of any alternative is to be measured against general project goals similar to those enunciated in the FEIS, *cf. Van Abbema*, 807 F.2d at 638, or against the scope of the proposed project in its initial phase. Subsidiary issues which should be discussed include the extent to which it is the prerogative of the applicant to prescribe the type, dimensions and goals of the project under NEPA; whether by proposing a two-berth facility, with the capacity for expansion to six berths, MDOT is entitled to have exactly *that* proposal *evaluated* under NEPA; or whether the present and future economic assumptions upon which MDOT based its proposal must be evaluated with a view to assessing their economic viability, thereby enabling the reviewing agency (and court) to distinguish legitimate project typing and scoping from pretextual proposals designed to render otherwise "reasonable alternatives" unnecessary of evaluation in the EIS.